Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

IN THE MATTER OF      )
     )
THE EXTRADITION OF      )      Misc. No. **4:24-mj-297**
     )
ISAC ALEJANDRO CALDERON      )

## COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.  In this matter, I represent the United States in fulfilling its treaty obligations to the United Kingdom of Britain and Northern Ireland (collectively, the "United Kingdom").

2.  There is an extradition treaty in force between the United States and United Kingdom.[1]

3.  Pursuant to the Treaty, the Government of the United Kingdom has submitted a formal request through diplomatic channels for the extradition of Isac Alejandro CALDERON ("CALDERON")

4.  According to the information the United Kingdom has provided, CALDERON is accused of causing serious injury by dangerous driving in violation of Section 1A of the Road Traffic Act of 1988 and Schedule 2 of the United Kingdom's Road Traffic Offenders Act of 1988.

---

[1] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC NO. 108-23 (2004) (the "2003 Treaty"), and related Exchanges of Letters, *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

5.     This offense was committed within the jurisdiction of the United Kingdom.  On December 1, 2023, District Judge Strongman at Kidderminster Magistrates' Court issued a warrant for CALDERON's arrest for this offense.  The warrant remains valid and enforceable.

6.     The extradition request presents the following facts as the basis for the complaint and arrest warrant:

a.     On July 31, 2023, at approximately 7:50 p.m., CALDERON was driving a silver Honda Accord on the A4103 road, a fifty mile per hour road in Shucknall, Herefordshire, United Kingdom.   Multiple eyewitnesses observed CALDERON dangerously overtaking several vehicles at high speed before crossing the solid white lines marking a no passing zone and which separated opposing lanes of traffic at a right-hand bend in the road, resulting in a head-on collision with a vehicle driven by Elizabeth Donowho ("the victim").

b.     The victim provided a statement describing the collision.  She explained that at the time of the collision, visibility was clear, and it was still daylight.  The weather was dry, and there were no other cars immediately in front or behind her, when suddenly, CALDERON's car appeared driving towards her in her lane of traffic.  She had no time to react before CALDERON's vehicle struck her head-on, and she briefly lost consciousness upon impact.  She later managed to regain consciousness and get out of the vehicle before she was transported to the hospital for treatment for her injuries.

c.     As a result of the collision, the victim suffered serious injuries, including fractures to both of her ankles, her sternum, and her hand.  The victim was hospitalized for two weeks and was unable to walk for six weeks.  Her mobility remains poor, and she has been told a full recovery is not possible.  As a result of the collision and her injuries,

2

she is experiencing ongoing mental health issues, including anxiety about driving and leaving her house, as well as nightmares and flashbacks. She has been unable to return to her job as a nurse, and she is unsure whether she will ever be able to do so.

d.     Police conducted various interviews with other drivers who were driving on A4103 at the time of the collision. One driver, Nazeem Hussain ("Hussain"), stated that he witnessed a silver vehicle pass him on a bend at approximately sixty miles per hour in a fifty mile per hour zone. The driver of the silver vehicle thereafter lost control of his car and hit another vehicle. Hussain's vehicle was fitted with a dashcam, the footage from which he provided to U.K. authorities, and which clearly captures the collision.

e.     A second driver, Emily McDermot ("McDermot"), did not witness the collision, but observed CALDERON driving dangerously prior to the collision. McDermot explained that she was traveling on the A4103 when a silver vehicle passed her at the top of a hill. McDermot estimated the vehicle was traveling at approximately seventy miles per hour when it passed her. McDermot then witnessed the silver car pass a small blue Fiat 500, narrowly avoiding a head on collision with an oncoming vehicle, before the silver car disappeared around a bend in the road.

f.     A third driver, Suzette Jones ("Jones"), similarly described a silver vehicle passing her car on a bend at high speed and narrowly missing a collision with a car traveling in the opposite direction. Jones stated that she saw the silver vehicle a few minutes later turned on its side in a hedge after apparently colliding with another vehicle.

g.     On August 15, 2023, PC Watkins interviewed CALDERON in the presence of an assigned legal representative. CALDERON explained that he was in the

United Kingdom for work, but at the time of collision, he was not working and instead was traveling to engage in personal activities. He further admitted that he was the driver of the silver Honda Accord that was involved in the collision. CALDERON claimed not to have any recollection of the crash because he lost consciousness. He also admitted that he had only obtained the silver Honda six days before to the collision and although the vehicle had a manual gearbox, he had no prior experience driving a vehicle with a manual transmission. CALDERON further explained that he had been driving a car in the United Kingdom since April 2023, utilizing rental cars before he obtained the silver Honda. Nevertheless, he claimed he was "not at all" familiar with road markings and traffic directions in the United Kingdom, and he did not know that the solid white lines on the road marked a no passing zone. When confronted with dashcam footage of the collision, CALDERON exclaimed "shit" and explained that he "wouldn't have called [his driving] dangerous" but based on the images depicted in the dashcam footage, "[he had] no other way to describe it . . . " When PC Watkins asked for CALDERON's thoughts on his driving after seeing the dashcam footage, CALDERON responded that his driving "was definitely not safe."

     h.    PC Wakins informed CALDERON that he would be facing charges for causing serious injury by dangerous driving and asked him if he had plans to leave the country. CALDERON assured PC Watkins that he was remaining in the United Kingdom until March 2024. On November 25, 2023, CALDERON left the United Kingdom.

     i.    The extradition request contains a copy of CALDERON's Texas Driver's License that he presented to PC Watkins during his police interview on August 15, 2023.

The extradition request also includes a copy CALDERON's United States Uniformed Services identification card.    PC Watkins confirmed that this identification card depicts CALDERON. In addition to interviewing CALDERON, PC Watkins was a first responder present following the collision and witnessed CALDERON receiving medical treatment at the scene.

7.    Based on information provided by the U.S. Marshals Service, CALDERON is believed to be residing in Humble, Texas, within the jurisdiction of this Court.

8.    Tom Heinemann, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty, stating that the Treaty covers the offense for which extradition is requested, and confirming that the documents supporting the request for extradition bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the United Kingdom, in accordance with Article 2 of the Annex, so as to enable them to be received into evidence.

9.    The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from the United Kingdom, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit 1) are filed with this complaint and incorporated by reference herein.

10.    CALDERON would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the

United States and the United Kingdom, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court, except as disclosure is needed for its execution, until such time as the warrant is executed.

Jay Hileman
Assistant United States Attorney

Sworn to before me telephonically this 1st day of July, 2024, and I find probable cause.

Honorable Peter Bray
United States Magistrate Judge

6

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

**4:24-mj-297**

## DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Isac Alejandro CALDERON. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and the United Kingdom are found in the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, signed at Washington March 31, 2003 (the "Treaty"), and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "Instrument"), with annex (the "Annex") and related Exchanges of Notes, signed at London December 16, 2004. A copy of the Instrument and Annex is attached to this declaration.

3. In accordance with the provisions of the Annex, the British Embassy has submitted Embassy Note No. 025/2024, dated 13 March 2024, formally requesting the extradition of CALDERON. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 20 of the Annex, the Government of the United States appears in court in the United States on behalf of, and represents the interests of, the United Kingdom in any proceeding that arises out of a U.K. request for extradition. The United

Kingdom provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

5. The offense for which extradition is sought is covered under Article 2 of the Annex.

6. Under Article 9 of the Annex, documents that bear the certificate or seal of the Ministry of Justice or Ministry or Department responsible for foreign affairs of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in London. The United Kingdom, in submitting documents in the instant case that bear the certificate or seal of the Home Office, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Santa Fe, New Mexico, on May 28th, 2024.


TOM HEINEMANN

Attachments:

1. Copy of Note

2. Copy of Instrument with Annex



**British Embassy**
**Washington**

Embassy Note No:- 025/2024

**REQUEST FOR THE EXTRADITION OF ISAC ALEJANDRO CALDERON FROM THE UNITED STATES OF AMERICA TO THE UNITED KINGDOM.**

His Britannic Majesty's Embassy presents its compliments to the Department of State and encloses documents in support of the extradition from the United States of America of Isac Alejandro CALDERON to the United Kingdom.

His extradition is sought under the UK-US Extradition Treaty 2003, as amended, as a person accused of the following offences:

- One offence of causing serious injury by dangerous driving contrary to Section 1A of the Road Traffic Act 1988 and Schedule 2 to the Road Traffic Offenders Act 1988

The Embassy would be grateful if the enclosed papers could be transmitted as soon as possible to the appropriate authorities with a request for the extradition of Isac Alejandro CALDERON.

In the event of his return being ordered the Embassy would appreciate being notified as soon as possible so that arrangements can be made for his prompt return to the United Kingdom.

His Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.

**British Embassy, Washington DC**

**13 March 2024**

EXT-CALDERON-00003

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.23

# EXTRADITION

**Instrument Amending the**

**Treaty of March 31, 2003**

**Between the**

**UNITED STATES OF AMERICA**

**and the UNITED KINGDOM OF**

**GREAT BRITAIN AND**

**NORTHERN IRELAND**

Signed at London December 16, 2004

*with*

Annex

*and*

Exchange of Notes



EXT-CALDERON-00004

NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# UNITED KINGDOM OF GREAT BRITAIN
# AND NORTHERN IRELAND

### Extradition

*Instrument amending the treaty of March 31, 2003.*
*Signed at London December 16, 2004;*
*Transmitted by the President of the United States of America*
  *to the Senate September 28, 2006 (Treaty Doc. 109-14,*
  *109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
  *July 29, 2008 (Senate Executive Report No. 110-12,*
  *110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
  *September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Instruments of Ratification*
  *at London July 6, 2009;*
*Entered into force February 1, 2010.*
*With annex and exchange of notes.*

Instrument as contemplated by Article 3(2) of the Agreement on Extradition
between the United States of America and the European Union signed 25 June 2003, as
to the application of the Extradition Treaty between
the Government of the United States of America and the Government of the
United Kingdom of Great Britain and Northern Ireland signed 31 March 2003

1.      As contemplated by Article 3(2) of the Agreement on Extradition between the
United States of America and the European Union signed 25 June 2003 (hereafter "the
Extradition Agreement"), the Governments of the United States of America and the
United Kingdom of Great Britain and Northern Ireland acknowledge that, in accordance
with the provisions of this Instrument, the Extradition Agreement is applied in relation
to the bilateral Extradition Treaty between the Government of the United States of
America and the Government of the United Kingdom of Great Britain and Northern
Ireland signed 31 March 2003 (hereafter "the 2003 Extradition Treaty") under the
following terms:

a)      Article 5(1) of the Extradition Agreement shall be applied as set forth in
Article 8(1) and 12(4) of the Annex to this Instrument to provide for the mode of
transmission of the extradition request and supporting documents;

b)      Article 5(2) of the Extradition Agreement shall be applied as set forth in
Article 9 of the Annex to this Instrument to provide for the requirements concerning
certification, authentication or legalization of the extradition request and supporting
documents;

c)      Article 7(1) of the Extradition Agreement shall be applied as set forth in
Article 12(4) of the Annex to this Instrument to provide for an alternative method for
transmission of the request for extradition and supporting documents following
provisional arrest;

d)      Article 8(2) of the Extradition Agreement shall  be applied as set forth in
Article 10(2) of the Annex to this Instrument to provide for the channel to be used for
submitting supplementary information;

e)      Article 10 of the Extradition Agreement shall be applied as set forth in
Article 15 of the Annex to this Instrument to provide for the decision on requests made
by several States for the extradition or surrender of the same person; and

f)      Article 14 of the Extradition Agreement shall be applied as set forth in Article
8 bis of the Annex to this Instrument to provide for consultations where the Requesting
State contemplates the submission of particularly sensitive information in support of a
request for extradition.

2.      The Annex reflects the integrated text of the operative provisions of the
2003 Extradition Treaty and the Extradition Agreement that shall apply upon entry into
force of this Instrument.

3.a)   This Instrument shall apply to the United States of America and to Great Britain and
Northern Ireland.  Subject to subparagraph b), the application of the 2003 Extradition Treaty to
the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which

1

the 2003 Extradition Treaty may apply in accordance with its terms, shall remain unaffected by the Extradition Agreement and this Instrument.

b)    This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 20(1) (b) of the Extradition Agreement, agree to extend its application thereto. The exchange of notes shall specify the authority in the territory responsible for the measure set forth in Article 9 of the Annex and the channels between the United States of America and the territory for transmissions pertaining to the extradition process, in lieu of those designated in the Annex. Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel, where duly confirmed between the United States of America and the United Kingdom in accordance with Article 20(2) of the Extradition Agreement.

4.    In accordance with Article 16 of the Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

5.    This Instrument shall not apply to requests for extradition made prior to its entry into force.

6.    (a) This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the Extradition Agreement.

(b)    In the event of termination of the Extradition Agreement, this Instrument shall be terminated and the 2003 Extradition Treaty shall be applied. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16 day of December 2004.

FOR THE GOVERNMENT OF
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE UNITED KINGDOM OF GREAT
BRITAIN AND NORTHERN IRELAND:

2

ANNEX

EXTRADITION TREATY
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND
NORTHERN IRELAND

## TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political and Military Offenses |
| Article 5 | Prior Prosecution |
| Article 6 | Statute of Limitations |
| Article 7 | Capital Punishment |
| Article 8 | Extradition Procedures and Required Documents |
| Article 8 *bis* | Sensitive Information in a Request |
| Article 9 | Authentication of Documents |
| Article 10 | Additional Information |
| Article 11 | Translation |
| Article 12 | Provisional Arrest |
| Article 13 | Decision and Surrender |
| Article 14 | Temporary and Deferred Surrender |
| Article 15 | Requests for Extradition or Surrender Made by Several States |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Waiver of Extradition |
| Article 18 | Rule of Specialty |
| Article 19 | Transit |
| Article 20 | Representation and Expenses |
| Article 21 | Consultation |
| Article 22 | Termination |

3

EXT-CALDERON-00009

## Article 1
### Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

## Article 2
### Extraditable Offenses

1.     An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.

2.     An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of this Article.

3.     For the purposes of this Article, an offense shall be an extraditable offense:

    (a)     whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

    (b)     whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

4.     If the offense has been committed outside the territory of the Requesting State, extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of this Treaty are met.

5.     If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

4

Article 3
Nationality

Extradition shall not be refused based on the nationality of the person sought.


Article 4
Political and Military Offenses

1.      Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2.      For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a)     an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b)     a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family;

(c)     murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

(d)     an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e)     placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(f)     possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(g)     an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any of the foregoing offenses.

3.      Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the competent authority of the Requested State determines that the request was politically motivated. In the United States, the executive branch is the competent authority for the purposes of this Article.

5

4.      The competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law. In the United States, the executive branch is the competent authority for the purposes of this Article.

## Article 5
### Prior Prosecution

1.      Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2.      The Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is requested.

3.      Extradition shall not be precluded by the fact that the competent authorities of the Requested State:

(a)     have decided not to prosecute the person sought for the acts for which extradition is requested;

(b)     have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

(c)     are still investigating the person sought for the same acts for which extradition is sought.

## Article 6
### Statute of Limitations

The decision by the Requested State whether to grant the request for extradition shall be made without regard to any statute of limitations in either State.

## Article 7

### Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed, or, if imposed, will not be carried out.

6

Article 8
Extradition Procedures and Required Documents

1.   All requests for extradition shall be submitted through the diplomatic channel.

2.   All requests for extradition shall be supported by:

(a)   as accurate a description as possible of the person sought, together with any other information that would help to establish identity and probable location;

(b)   a statement of the facts of the offense(s);

(c)   the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested;

(d)   the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested; and

(e)   documents, statements, or other types of information specified in paragraphs 3 or 4 of this Article, as applicable.

3.   In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall be supported by:

(a)   a copy of the warrant or order of arrest issued by a judge or other competent authority;

(b)   a copy of the charging document, if any; and

(c)   for requests to the United States, such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested.

4.   In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been convicted of the offense for which extradition is sought shall be supported by:

(a)   information that the person sought is the person to whom the finding of guilt refers;

(b)   a copy of the judgment or memorandum of conviction or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

(c)   a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

7

(d)     in the case of a person who has been convicted *in absentia*, information regarding the circumstances under which the person was voluntarily absent from the proceedings.

## Article 8 bis
### Sensitive Information in a Request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

## Article 9
### Authentication of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall mean, for the United States, the United States Department of Justice; and, for the United Kingdom, the Home Office.

## Article 10
### Additional Information

1.     If the Requested State requires additional information to enable a decision to be taken on the request for extradition, the Requesting State shall respond to the request within such time as the Requested State requires.

2.     Such additional information may be requested and furnished directly between the United States Department of Justice and the Home Office.

## Article 11
### Translation

All documents submitted under this Treaty by the Requesting State shall be in English or accompanied by a translation into English.

## Article 12
### Provisional Arrest

1.     In an urgent situation, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition.  A

8

request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and such competent authority as the United Kingdom may designate for the purposes of this Article.

    2.    The application for provisional arrest shall contain:

        (a)    a description of the person sought;

        (b)    the location of the person sought, if known;

        (c)    a brief statement of the facts of the case including, if possible, the date and location of the offense(s);

        (d)    a description of the law(s) violated;

        (e)    a statement of the existence of a warrant or order of arrest or a finding of guilt or judgment of conviction against the person sought; and

        (f)    a statement that the supporting documents for the person sought will follow within the time specified in this Treaty.

    3.    The Requesting State shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

    4.    A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the documents supporting the extradition request as required in Article 8. For this purpose, receipt of the formal request for extradition and supporting documents by the Embassy of the Requested State in the Requesting State shall constitute receipt by the executive authority of the Requested State.

    5.    The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 13
Decision and Surrender

    1.    The Requested State shall promptly notify the Requesting State of its decision on the request for extradition. Such notification should be transmitted directly to the competent authority designated by the Requesting State to receive such notification and through the diplomatic channel.

9

2.      If the request is denied in whole or in part, the Requested State shall provide reasons for the denial.  The Requested State shall provide copies of pertinent judicial decisions upon request.

3.      If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.

4.      If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

### Article 14
#### Temporary and Deferred Surrender

1.      If the extradition request is granted for a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution.  If the Requested State requests, the Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States.

2.      The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

### Article 15
#### Requests for Extradition or Surrender Made by Several States

1.      If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2.      If the United Kingdom receives an extradition request from the United States and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its executive authority shall determine to which State, if any, it will surrender the person.

3.      In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

10

(a)   whether the requests were made pursuant to a treaty;
(b)   the places where each of the offenses was committed;
(c)   the respective interests of the requesting States;
(d)   the seriousness of the offenses;
(e)   the nationality of the victim;
(f)   the possibility of any subsequent extradition between the requesting States; and
(g)   the chronological order in which the requests were received from the requesting States.

### Article 16
### Seizure and Surrender of Property

1.     To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items in whatever form, and assets, including proceeds, that are connected with the offense in respect of which extradition is granted. The items and assets mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.     The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable.  The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

### Article 17
### Waiver of Extradition

If the person sought waives extradition and agrees to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

### Article 18
### Rule of Specialty

1.     A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)   any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense on which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b)   any offense committed after the extradition of the person; or

(c)   any offense for which the executive authority of the Requested State waives the rule of specialty and thereby consents to the

11

person's detention, trial, or punishment.  For the purpose of this subparagraph:

    (i)    the executive authority of the Requested State may require the submission of the documentation called for in Article 8; and

    (ii)   the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request for consent is being processed.

    2.    A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

    3.    Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of the person to a third State, if the person:

    (a)    leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

    (b)    does not leave the territory of the Requesting State within 20 days of the day on which that person is free to leave.

    4.    If the person sought waives extradition pursuant to Article 17, the specialty provisions in this Article shall not apply.

## Article 19
### Transit

    1.    Either State may authorize transportation through its territory of a person surrendered to the other State by a third State or from the other State to a third State.  A request for transit shall contain a description of the person being transported and a brief statement of the facts of the case.  A person in transit shall be detained in custody during the period of transit.

    2.    Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State.  If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 1 of this Article, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours of the unscheduled landing.

12

## Article 20
### Representation and Expenses

1.     The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same.

2.     The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered.  The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3.     Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

## Article 21
### Consultation

The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

## Article 22
### Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

13

**EMBASSY OF THE**
**UNITED STATES OF AMERICA**

No. 120

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honor to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America
    London, England.  December 16, 2004



The Consular Directorate of the Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Embassy's Note No. 120 of 16 December 2004 which reads as follows:

"The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honour to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the United States of America and the Government of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honour to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of this opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration."

In reply, the Foreign and Commonwealth Office has the honour to confirm that the proposal set out in the Embassy's Note is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland and that the Embassy's Note, and this Reply, shall constitute an agreement between the two Governments which shall enter into force on the date of entry into force of the Instrument.

The Consular Directorate of the Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

London
16 December 2004

Note No. 30/10

The Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed on 25 June 2003, as to the application of the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16 December 2004, the Foreign and Commonwealth Office has the honour to confirm that the necessary domestic legislation is now in place to allow the Government of the United Kingdom of Great Britain and Northern Ireland to apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.



Embassy of the United States of America
24 Grosvenor Square
London
W1A 1AE

20 October 2010

EMBASSY OF THE UNITED STATES OF AMERICA
LONDON

No. 108

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to acknowledge receipt of Diplomatic Note No. 30/10, dated October 20, 2010, from Her Majesty's Foreign and Commonwealth Office which reads as follows:

"The Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed on 25 June 2003, as to the application of the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16 December 2004, the Foreign and Commonwealth Office has the honour to confirm that the necessary domestic legislation is now in place to allow the Government of the United Kingdom of Great Britain and Northern Ireland to

- 2 -

apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration."

On behalf of the United States Government, the Embassy has the honor to confirm that pursuant to the Foreign and Commonwealth Office's note and this Note in reply, Article 5(2) of the Agreement on Extradition between the United States and the European Union, as set forth in Article 9 of the Annex to the Instrument, applies between the two Governments as of the date of this note.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America

London, England.  November 23, 2010



ertify that, to the best of my knowledge and belief, the signature on the
rant dated 1 December 2023, contained herein, is the signature of Ian
n, a District Judge at Kidderminster Magistrates' Court, Comberton Place,
ster, Worcestershire, DY10 1QQ. United Kingdom.

rtify that all the documents authenticated here are under the Seal of the
of State and are in support of the request for the surrender of **Mr Isac**
**CALDERON.**

**Harj Dhesi**
Extradition Section
Home Office

13 March 2024

EXT-CALDERON-00026

# RE: THE EXTRADITION

## OF

## ISAC ALEJANDRO CALDERON

## FROM

## THE UNITED STATES
## OF AMERICA

## INDEX TO STATEMENTS AND EXHIBITS

| Name | Page No. |
| --- | --- |
| WATKIN, Richard Tudor (Statement of Facts) | 1 - 4 |
| Exhibit RTW/1 – Driving Licence | 5 - 6 |
| Exhibit RTW/2 – Arrest Warrant | 7-8 |
| Exhibit RTW/3- Army Card | 9 - 10 |
| Exhibit RTW/4 – Interview Record | 11 - 21 |
| LEONARD, Kate (Statement of Law) | 22 - 25 |

EXT-CALDERON-00028

**RICHARD TUDOR WATKINS states as follows:**

**INTRODUCTION**

1.  I am a Police Constable of West Mercia Police force based at Hereford Police station within the jurisdiction of England and Wales which is a constituent part of the United Kingdom of Great Britain and Northern Ireland.

2.  I make this deposition in connection with the extradition request for Isac Alejandro Calderon (hereafter 'Calderon'). His date of birth is 07 February 2001.

3.  I have been made aware that Calderon left the UK on 25 November 2023. Calderon's driving licence gives an address of 19700 Whitaker Dr Apt 415 Humble, Texas. I produce a copy of this driving licence as my exhibit RTW/1.

4.  I attach as my exhibit RTW/2 a warrant of arrest issued by District Judge Strongman at Kidderminster Magistrates' Court on 1 December 2023 for one offence of causing serious injury by dangerous driving contrary to section 1A of the Road Traffic Act 1988 and Schedule 2 to the Road Traffic Offenders Act 1988. I note that the warrant has on it the name of Issac Calderon DOB 07 February 2001, I can confirm that this is the same person as Isac Calderon.

5.  The police sent a postal requisition to Calderon's UK address which required him to attend Kidderminster Magistrates' Court on 1 December. He did not attend and the warrant was issued for his arrest.

**I.   PHYSICAL IDENTIFICATION OF CALDERON**

6.  I attach, as my exhibit **RTW/3**, a photograph of Calderon on a Uniformed Services Army card. I confirm this is a true likeness of Calderon. On 31 July at 20.00 I attended the scene of a road traffic accident involving Mr Calderon with my colleague PC Dennett and observed him receiving medical treatment.

7.   Calderon is a citizen of the United States of America and a member of the United States military.

## II.   THE FACTS

### 8.   Summary

On 31 July at 19:50 hours Calderon was involved in a road traffic collision on the A4103 at Shucknall in Herefordshire. Calderon was seen to overtake other vehicles on the same side of the road that he was driving on. The speed limit for the road was 50 miles per hour. He was in excess of the speed limit. He then crossed solid white lines separating two lanes of traffic before colliding with a vehicle driven by Ms Elizabeth Donowho. There was no opportunity for Ms Donowho to avoid the collision. Ms Donowho suffered serious injury including fractures to both of her ankles, a fractured sternum and a fracture to her hand. She remained in hospital for over two weeks.

A summary of the evidence is detailed below:

### Evidence from Elizabth Donowho

9.   Ms Donowho states on 31 July 2023 she was driving her grey Mercedes A200 along the A4103. The visibility was clear and it was still daylight. The weather was dry and there were no other cars immediately in front or behind her. All of sudden a car appeared coming towards her from across the road. She had no time to react. She briefly lost consciousness at the impact but then managed to get out of the vehicle. An ambulance took er to hospital where she remained for two weeks. She suffered two broken ankles and fractures to her sternum and hand. She was unable to walk for six weeks. Her mobility remains poor and she has been told a full recovery is not possible. She has been unable to return to her job as a nurse and is not sure this will ever be possible. She is anxious about leaving the house, feels unable to drive and has been experiencing mental health issues, such as nightmares and flashbacks.

Evidence from Nazeem Hussain

10. He was driving on the A4103 on that evening. He became aware of a silver vehicle overtaking him on a bend. He witnessed that vehicle lose control and hit another vehicle. He estimates the driver was driving at approximately 60 miles per hour. His vehicle was fitted with a dashcam which recorded the collision with very clear front and rear views.

Evidence of Emily McDermot.

11. Ms McDermot was also driving on the A4103 that evening. She became aware of a silver car travelling at approximately 70 miles per hour and overtaking her on the brow of a hill. She then saw the silver car overtake a small blue Fiat 500, narrowly avoiding a head on collision with an oncoming vehicle. She lost sight of the silver car for 30 seconds as it rounded a bend.

Evidence of Ms Suzette Jones.

12. Ms Jones was also driving on the A4103 that evening. She described being overtaken at speed by a silver car on a bend which narrowly missed a collision with an oncoming vehicle. A few minutes later she saw the same car on its side in a hedge and another car stationary in the road. It looked as though the silver car had collided with the other car.

Summary of Interview with Isac Calderon

13. I conducted a voluntary interview with Mr Calderon at Hereford Police Station on 15 August 2023. He admitted driving a silver Honda Accord registration ND57 XYB at the time, date and place of the incident. He remembered the crash and accepted that his driving was definitely not safe. He was informed that he would be reported for causing serious injury by dangerous driving. He was asked if he planned to leave the country

and confirmed that he was remaining in the UK until March 2024.  I produce the record of interview as my exhibit **RTW/4.**

Signed:

RICHARD TUDOR WATKINS

Dated: 6th March 2024

4

EXHIBIT

This is Exhibit RTW/1 a driving licence in the name of Isac Calderon and referred to in the deposition of Richard Tudor Watkins.

*R Watkins*
---------------------------------------------
Richard Tudor Watkins

EXHIBIT

This is Exhibit RTW/2 a warrant of arrest issued for Isac Calderon by District Judge Strongman on 1 December 2023 and referred to in the deposition of Richard Tudor Watkins.

_R. Watkins_

-------------------------------------

Richard Tudor Watkins



Worcestershire Magistrates' Court
Code 1894
Sitting at Kidderminster Magistrates' Court

# Warrant of Arrest (Offence)
## Without Bail

To: Police

**Date of order** 01 December 2023

**Defendant**
Issac CALDERON
8 Chapel Court Church Street
Stilton
Peterborough
Cambridgeshire
PE7 3FL

**Case reference** 22TP1266023
**Date of birth** 07 February 2001
**ASN** 2300000000001152541L

**Reason for arrest:** first instance

## Order

The defendant shall be arrested in connection with the offences listed for the reason stated and brought at once before:

Kidderminster Magistrates' Court
Comberton Place
Kidderminster
Worcestershire
DY10 1QQ

**Case reference:** 22TP1266023

On 31/07/2023 at Shucknall in the county of Herefordshire caused serious injury to Elizabeth DONOWHO by driving a mechanically propelled vehicle, namely Honda Accord vehicle registration ND57 XYB, dangerously on a road namely A4103 From Pomona Lane to C1148 Contrary to section 1A of the Road Traffic Act 1988 and Schedule 2 to the Road Traffic Offenders Act 1988.



Worcestershire Magistrates' Court
Code 1894
Sitting at Kidderminster Magistrates' Court

*Ian Strongman*
*District Judge (Magistrates'*
*Court)*

EXHIBIT

This is Exhibit RTW/3 a Uniformed Services Army Card in the name of Isac Calderon and referred to in the deposition of Richard Tudor Watkins.

R. Watkins
--------------------------------
Richard Tudor Watkins

EXT-CALDERON-00039

EXHIBIT

This is Exhibit RTW/4 a record of interview with Isac Calderon on 15 August 2023 and referred to in the deposition of Richard Tudor Watkins.

Richard Tudor Watkins

RESTRICTED (when complete)

MG15
Page 1 of 11

URN:

# RECORD OF INTERVIEW

ROTI

| | |
|---|---|
| Person interviewed: | Isac CALDERON (07/02/2001) |
| Place of interview: | Hereford Police Station |

Police Exhibit No:

Number of pages: 11

*R Austin*

Signature of interviewer/transcriber producing exhibit

| | |
|---|---|
| Date of interview: | Tuesday 15th August 2023 |
| Time commenced: | 11:04 hours |
| Duration of interview: | 28 minutes |
| Audio tape ref nos: (◆) | 22/3045VA/2023 |
| Interviewer(s): | PC 3132 WATKINS and PC 22183 DENNETT |
| Other persons present: | Jenny CLARKE - Legal Representative from G.C Law (SOL) |

Time concluded: No time stated

Visual image ref nos: (◆)

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| 00:07 | | Introductions. Voluntary interview – advised not under arrest and free to leave at any time. Entitlement to free and independent legal advice. TR2 Notice explained. Caution given, explained and understood. |
| | PC 3132 | Were you the driver of a silver Honda Accord registration ND57 XYB when it was involved in a road traffic collision on the A4103 at Shucknall, Herefordshire at approximately 19:52 hours on Monday 31st July 2023? |
| | R | I remember the crash. I don't remember the registration number, everything else is correct. |
| | PC 3132 | Ok, so you can't remember the registration number? |
| | R | No I cannot. |
| 03:53 | PC 3132 | But you were the driver of a silver Honda Accord? |
| | R | Yes. |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

2023

RESTRICTED (when complete)

Matthews,Nikki/08/23(15 99)

Person interviewed:    Isac CALDERON (07/02/2001)        URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | PC 3132 | Who is the registered keeper of that vehicle? |
| | R | The registered keeper I believe is Sean, first name (inaudible) his last name. |
| 04:16 | PC 3132 | If that vehicle does not belong to you, had you bought it or did you have the owner's permission to drive it? |
| | R | I had the owner's permission to drive it and I was buying it for 2,000 quid I think.  I was paying monthly on it so my (inaudible) comes up in two weeks.  I had just bought it like maybe 5 days before. |
| | PC 3132 | So did the vehicle have an MOT? |
| | R | I don't know what that is so probably not. |
| | PC 3132 | Was it taxed?  Did it have road tax? |
| | R | I know it had road tax leftover from what Shaun told me.  I just had to go after the 31st and road tax it. |
| | PC 3132 | When you started your journey that day in the Honda did you have any motor insurance for that vehicle? |
| | R | I don't know if I did or not. |
| | PC 3132 | Did you at any time look into getting insurance for that vehicle? |
| | R | Yes I did. |
| | PC 3132 | And did you purchase it or not? |
| | R | No I didn't because every place kept on asking for past driving record but I don't have any. |
| 06:03 | PC 3132 | So you didn't have any insurance for the vehicle? |
| | R | Not that I know of.  I just know it was sold to me by Sean. |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

**RESTRICTED (when complete)**

Person interviewed:   Isac CALDERON (07/02/2001)          URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | PC 3132 | Is Sean a friend? |
| | R | No he was the seller of the car. |
| | PC 3132 | So you don't know him personally? |
| | R | No I don't. |
| 06:22 | PC 3132 | At the time of the collision were you accompanied?  Did you have anybody else in the vehicle with you? |
| | R | No I did not. |
| | PC 3132 | Do you wear glasses or contact lenses for driving? |
| | R | No I don't. |
| | PC 3132 | How long have you held a driving licence? |
| | R | I've held it since after the 31st of last year I think, let me look at my wallet. |
| | | PC WATKINS advised that CALDERON presented him with a Texas, USA driver's licence with a DL number of 48429759 issued on 31st October 2022. |
| | PC 3132 | So with your driving licence explain to me the test that you passed in America if you would? |
| | R | (Inaudible) 15-20 minutes, don't hit any cars, don't park too far away from the kerb, don't park too close to the kerb either.  That was basically it, I mean just parallel park, drive and then park regular so reverse or going in, I forget what it's called in English and then you're done. |
| 08:16 | PC 3132 | And that's by somebody who obviously examines your standard of driving? |

Signature(s):
(Contemporaneous notes only)

◆ Not relevant for contemporaneous notes

2010/11

**RESTRICTED (when complete)**

Matthews,Nikki/08/23(15
99)

██████████████ **RESTRICTED (when complete)** ████████ MG15

Page 4 of 11

Person interviewed:   Isac CALDERON (07/02/2001)         URN: [                    ]

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | R | Yes. |
| | PC 3132 | Do you have any medical conditions which may affect your driving? |
| | R | No. |
| 08:31 | PC 3132 | Can you explain to me how the collision occurred on that Monday? |
| | R | So surprisingly enough I lost consciousness as soon as I (inaudible) the vehicle so I don't remember anything that happened during the crash, I woke up in the hospital. |
| | PC 3132 | So what was journey that day? |
| | R | The journey was pretty uneventful. |
| | PC 3132 | Where had you driven from? |
| | R | Driving from Huntingdon. |
| | PC 3132 | And what was your destination. |
| | R | Hereford. |
| | PC 3132 | Whereabouts in Hereford? |
| | R | I think it's Whitecross something.  I don't know the address because (inaudible) there but I was going over to play with the games and I crashed 5 minutes away from his place. |
| | PC 3132 | So it wasn't for business purposed your journey? |
| | R | No it wasn't. |
| 09:34 | PC 3132 | It was for…? |
| | R | Personal. |
| | PC 3132 | What time did you set off from Huntingdon? |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

EXT-CALDERON-00046                                      14

Person interviewed:   Isac CALDERON (07/02/2001)          URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | R | I don't remember if I'm completely honest. |
| | PC 3132 | Afternoon or morning? |
| | R | I don't have any recollection of before the crash. |
| 10:00 | | CALDERON stated that he had been in the UK since March and has been driving here since April. |
| | PC 3132 | Did you have any additional training on driving in the UK? |
| | R | No I wasn't. |
| | PC 3132 | So you've acquired a car by yourself? |
| | R | Correct. |
| | PC 3132 | And you've been driving that vehicle since April? |
| | R | Wrong, I've been driving the current vehicle since July 25th. |
| | PC 3132 | So you've had that silver Accord since July 25th. And prior to that you'd been driving on a daily basis? |
| | R | A rental. |
| | PC 3132 | So how familiar would you say you were with driving in the UK and driving on the left as opposed to the right in the states? |
| | R | It wasn't too different but I get mixed up on the signs all the time. |
| | PC 3132 | Can you remember on that journey what the weather conditions were like? |
| | R | I can't remember at all. |
| 11:29 | PC 3132 | The lighting conditions? |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

Person interviewed:   Isac CALDERON (07/02/2001)         URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | R | I don't remember.  I know I was told it was raining but I don't have any recollection of it raining nor do I have any recollection of it not raining. |
| | PC 3132 | So you can't remember what the road surface was like? |
| | R | At all. |
| 11:46 | PC 3132 | Can you remember what sort of speed you were travelling prior to the collision? |
| | R | I know I was going at the speed permit so 50-55. |
| | PC 3132 | And I was going to say, do you know what the speed limit is for the road where the collision took place? |
| | R | I don't if I'm being completely honest. |
| | PC 3132 | And how familiar would you say you were with the vehicle you were driving at the time?  You say you picked it up on the 25th July, had you been driving it on a daily basis? |
| | R | On a daily yes but since the 25th so 6 days. |
| | PC 3132 | And it was a manual gearbox? |
| | R | Correct. |
| | PC 3132 | How familiar are you driving with manual gearboxes? |
| | R | First time driving manual shift was Friday. |
| | PC 3132 | Can you remember, in the vehicle did you have any sort of distractions, were you listening to music? |
| | R | I was listening to music but it wasn't loud at all. |
| 13:08 | PC 3132 | So was it the radio or was it a playlist? |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

Matthews,Nikki/08/23(15 99)

EXT-CALDERON-00048

16

Person interviewed:   Isac CALDERON (07/02/2001)          URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | R | It was a playlist but I had a headphone in. |
| | PC 3132 | You weren't distracted by your mobile phone or anything like that? |
| | R | No sir I wasn't. |
| | PC 3132 | On that evening in question Isac prior to the collision, we've had a number of witnesses come forward that have described the vehicle you were driving overtaking them in a dangerous manner, or driving erratically. So your experience of driving in the UK, what do our road markings mean? What does a solid white line mean to you? |
| | R | I don't know what that at all means. I know that slash through and then circle is National Speed Limit and I know that x with the red and then blue circle means don't stop, circle with blue and then red circle surrounding it I think means you need to stop I think. |
| 14:52 | PC 3132 | So how familiar are you with our road markings and our traffic directions? |
| | R | Not at all. I used to play follow the leader. |
| | PC 3132 | You play follow the leader? |
| | R | Yes sir. I follow the person in front of me and I stop when they stop. |
| | | CALDERON is shown Exhibit NH/1 which is dashcam footage from a front-facing dashcam of a white van that was driven by one of the witnesses. |
| | PC 3132 | Do you remember overtaking a white van at all prior to the collision? |
| | R | No prior no. |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

2010/11

Matthews,Nikki/08/23(15
99)

**RESTRICTED (when complete)**

Person interviewed:   Isac CALDERON (07/02/2001)          URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
|  | PC 3132 | So this is a white van that's travelling in the same direction as you from Worcester towards Hereford on the A4103 on the evening in question. So he's approaching the village of Shucknall now and I don't know if you can notice but these road markings here and the towing in arrows on the road, that solid white line means you shouldn't overtake. So an Audi goes past and then this is you. |
|  | R | Shit. |
| 17:49 | PC 3132 | Do you wanna see that again? |
|  | R | Sure. |
|  | PC 3132 | So solid white lines either side of the carriageway means nobody can overtake, these long white lines say that either vehicle on either carriageway can overtake, this solid white line on your side of the road means that you can't overtake but they can on the opposite carriageway. So you can't overtake there coz there's a solid white line and these are double solid white lines so nobody can overtake. So theoretically you can overtake on your side of the road but there are the towing in arrows telling you to get back across onto your side of the road and then there's a solid white line. That's an Audi that's gone through. There you go, you've followed him and you've lost control on that bend. |
|  | R | Shit. Is there person in the other car ok? |
|  | SOL | She's got injuries, just injuries I've told you about. She's still alive. |
| 19:29 |  | CALDERON is shown Exhibit NH/2 which is rear facing camera footage from the same white Mercedes van and he explained that it's a mirror image because of the way the camera works. |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

**RESTRICTED (when complete)**

Matthews,Nikki/08/23(15 99)

RESTRICTED (when complete)

Person interviewed:   Isac CALDERON (07/02/2001)          URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | PC 3132 | So that Audi's gone for the overtake, you've gone for the overtake and these are the solid lines, and then we come to a stop there. So having seen that footage does that give you any sort of recollection as to what…? |
| | R | No (inaudible), but shit. |
| 20:54 | PC 3132 | What's your immediate reaction to seeing that footage? |
| | R | Shit is my reaction.  Sorry for my (inaudible) language but shit. |
| | PC 3132 | Would you say that the driving you exhibited in that footage is dangerous? |
| | R | I wouldn't have called it dangerous but looking at the imagery rear and front facing dashcams shit, because I've no other way to describe it, I mean… |
| | PC 3132 | And the road markings in question, the way I've described them does that make sense?  That if a solid white line is on your side of the carriageway, on your offside as you're driving along it's there to tell you not to overtake? |
| | R | I see that. |
| | PC 3132 | And that's because you were approaching that right-hand bend there ok and the towing arrows were if you were making an overtake perhaps on a slow-moving vehicle they were telling you to get back in before the solid white lines.  Does that make sense? |
| | R | That makes sense. |
| 22:40 | PC 3132 | In the UK we look at your driving that you should be able to stop on your own side of the road within a distance you can see to be |

Signature(s):
(Contemporaneous notes only)

◆   Not relevant for contemporaneous notes

2010/11

RESTRICTED (when complete)

Matthews,Nikki/08/23(15
99)

Person interviewed:   Isac CALDERON (07/02/2001)                    URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | | clear.  Having seen that video or that dashcam what are your views on that? |
| | R | That was definitely not safe. |
| | PC 3132 | It wasn't safe? |
| | R | No it wasn't. |
| 23:16 | | PC WATKINS advised that the other driver was a lady and she has sustained two broken ankles and a broken sternum.  He explained that she is currently convalescing in a community hospital so she is on the mend. |
| | | When asked what injuries he had sustained CALDERON stated that he had a concussion and he has a broken humerus. |
| | SOL | Very lucky that that lady didn't die coz it would have been a very different situation. |
| | | PC WATKINS advised that in Calderon's vehicle the post that separates the rear door from the front door was almost touching the driving seat which is quite serious.  He explained that fortunately members of the public that were nearby came and assisted and got him out of the vehicle and emergency services were quickly on scene. |
| | | It was explained to CALDERON by PC DENNETT and his solicitor that had he killed somebody he would probably go to prison and the maximum term is 14 years so he should be mindful of this going forward if he's considering driving in this manner again. |
| | PC 3132 | Isac what are your movements now? |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

Matthews,Nikki/08/23(15
99)

RESTRICTED (when complete)

MG15
Page 11 of 11

Person interviewed:   Isac CALDERON (07/02/2001)          URN:

| Tape Counter Times (◆) | Person Speaking | Text |
|---|---|---|
| | R | My movements are to go back to Huntingdon, transfer the police station to Huntingdon and the hospital to Huntingdon but I see now that I can't do the police side I think. |
| | | PC WATKINS explained to CALDERON that contact would be made with Cambridgeshire Police on his behalf. |
| | PC 3132 | You have no plans to leave the country in the near future? |
| | R | No I don't.  I'm here until March. |
| | PC 3132 | And you're working over here, I've seen your visa. |
| | R | Correct. |
| | | CALDERON asked whether he could visit the IP and PC WATKINS advised that he could pass on any message to her. |
| | R | Can you tell her I'm really sorry about the accident. |
| | PC 3132 | Is there anything you'd like to add or clarify? |
| | R | I was vaping in the car. |
| | PC 3132 | Was that at the time? |
| | R | I don't know, I just know I was vaping.  I can't think of anything else, honestly. |
| | | PC WATKINS advised CALDERON that he will be reported for the offence of Causing serious injury by dangerous driving and Driving without third party insurance and he cautioned him. |
| | | No-one present wished to add or clarify anything further. |
| 28:05 | | Interview concluded.  No finish time stated before the discs were switched off. |

Signature(s):
(Contemporaneous notes only)

◆  Not relevant for contemporaneous notes

2010/11

RESTRICTED (when complete)

Matthews,Nikki/08/23/15
99)

**KATE LEONARD states as follows:**

## I.  INTRODUCTION

1.  I am a barrister practising within the jurisdiction of England and Wales which is a constituent part of the United Kingdom of Great Britain and Northern Ireland. I am currently employed as a Specialist Prosecutor by the Crown Prosecution Service.  My expertise includes criminal law and the law of extradition. I am well acquainted with the criminal law of England and Wales.

2.  I confirm that I have seen a copy of the warrant of arrest for Calderon issued by District Judge Strongman sitting at Kidderminster Magistrates' Court on 1 December 2023.

3.  None of the conduct occurred outside of the jurisdiction of England and Wales.

4.  The conduct is clearly an extradition offence under the Extradition Act 2003.

5.  Calderon's extradition is sought so that he may be prosecuted for one offence of causing serious injury by dangerous driving contrary to section 1A of the Road Traffic Act 1988 and Schedule 2 to the Road Traffic Act 1988.

## II.  APPLICABLE UK LEGAL PROVISIONS

6.  A person who causes serious injury to another person by driving a mechanically propelled vehicle on a road or other public place dangerously is guilty of an offence contrary to section 1A of the Road Traffic Act 1988.

7.  Section 1A(2) of the Road Traffic Act 1988 defines serious injury as physical harm which amounts to grievous bodily harm for the purposes of the Offences Against the Person Act 1861.

8.  There is no distinction between grievous bodily harm and serious bodily harm. The totality of the injuries may be taken into consideration provided they have

1

been inflicted in one attack or the charge sets out the period over which numerous attacks took place. The assessment of whether harm amounts to being grievous bodily harm is an objective one rather than being based on the perception of the victim, however the characteristics of the victim should be a consideration. For example, what may be to be a minor injury to an adult may amount to a serious one for a child. The injury need not be a permanent one and can include unconsciousness. Serious harm can include psychiatric injury. Grievous bodily harm may cover such scenarios where there is no wounding, such as broken bones.

9. A road includes a public road, any part of a public road and any bridges or tunnels over or through which a public road passes, and any street, carriageway, highway or roadway to which the public has access.

10. Section 2A of the Road Traffic Offences Act 1988 defines the term "dangerous driving" for the purposes of the offence of causing serious injury by dangerous driving contrary to section 1A. For the purposes of section 1A a person is to be regarded as driving dangerously if:

> (a) The way he drives falls far below what would be expected of a competent and careful driver, and

> (b) It would be obvious to a competent and careful driver that driving in that way would be dangerous.

11. Schedule 2 of the Road Traffic Offenders Act sets out the sentencing provisions for the offence. The offence is triable either summarily or on indictment. The maximum penalty is 5 years imprisonment. There is no time limit for the institution of proceedings for this offence.

### A.   Extradition

12. Extradition to and from the UK is governed by the UK Extradition Act 2003 (hereafter 'EA 2003').

13. Section 150 EA 2003 provides the specialty constraints that will be observed by the UK in connection with this case.

> (1)This section applies if—
> (a)a person is extradited to the United Kingdom from a category 2 territory under law of the territory corresponding to Part 2 of this Act, and
> (b) the territory is a Commonwealth country, a British overseas territory or the Hong Kong Special Administrative Region of the People's Republic of China.
>
> (2)The person may be dealt with in the United Kingdom for an offence committed before his extradition only if—
> (a)the offence is one falling within subsection (3), or
> (b)the condition in subsection (6) is satisfied.
> [This is subject to section 151B.]
>
> (3)The offences are—
> (a)the offence in respect of which the person is extradited;
> (b)a lesser offence disclosed by the information provided to the category 2 territory in respect of that offence;
> (c)an offence in respect of which consent to the person being dealt with is given by or on behalf of the relevant authority.
>
> (4)An offence is a lesser offence in relation to another offence if the maximum punishment for it is less severe than the maximum punishment for the other offence.
>
> (5)The relevant authority is—
> (a)if the person has been extradited from a Commonwealth country, the government of the country;
> (b)if the person has been extradited from a British overseas territory, the person administering the territory;
> (c)if the person has been extradited from the Hong Kong Special Administrative Region of the People's Republic of China, the government of the Region.
>
> (6)The condition is that the protected period has ended
>
> (7)The protected period is 45 days starting with the first day after his extradition to the United Kingdom on which the person is given an opportunity to leave the United Kingdom.
>
> (8)A person is dealt with in the United Kingdom for an offence if—
> (a)he is tried there for it;
> (b)he is detained with a view to trial there for it.

14. The circumstances in which a further request for consent can be made by the UK are outlined at section 151B EA 2003. This provides:

> (1)Section 150 or 151A does not prevent a person in whose case that section applies from being detained with a view to trial in England and Wales for an offence if the conditions in subsection (2) are satisfied.
> (2)The conditions are that—
> (a)the United Kingdom and the territory from which the person was extradited have each made a declaration under Article 14(3) of the Extradition Convention, and the declarations are still in force;
> (b)the Secretary of State makes a request for the consent referred to in section 150(3)(c) or 151A(3)(c) in respect of the offence ("the consent request");
> (c)the Secretary of State gives notification, which is explicitly acknowledged on behalf of the territory, of the date on which the detention is to begin ("the notified date").

(3)The Extradition Convention is the European Convention on Extradition done at Paris on 13 December 1957.

(4)This section applies only to detention during the period beginning with the notified date and ending with whichever of the following occurs first—

(a)if a notification of opposition to the detention is given on behalf of the territory, the date on which Secretary of State receives it;

(b)the date on which the Secretary of State receives notification given on behalf of the territory as to whether the consent request is granted or refused;

(c)the expiry of the period of 90 days beginning with the date on which the consent request is received.

15. Section 153C EA 2003 states that if the Requested State extradites an individual for the purposes of prosecution in the UK subject to the condition that he should be returned to serve any sentence in the Requested state; that that undertaking can be given on behalf of the UK by the Secretary of State for the Home Department.

**Signed:**

_K. M Leonard_

**KATE LEONARD**

**Dated:** 29/2/2024



British Embassy
Washington

Embassy Note No:- 064/2024

**SUPPLEMENTAL INFORMATION TO THE REQUEST FOR THE EXTRADITION OF ISAC ALEJANDRO CALDERON FROM THE UNITED STATES OF AMERICA TO THE UNITED KINGDOM.**

His Britannic Majesty's Embassy presents its compliments to the Department of State and provides the following supplemental information in support of the extradition from the United States of America of Isac Alejandro CALDERON to the United Kingdom in reference to the diplomatic note 025/2024 dated 13 March 2024.

The supplementary deposition is to formally produce the statute setting out the law relating to section 1A of the Road Traffic Act 1988.

His Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.



**British Embassy, Washington DC**

**10 June 2024**



# C.R.

I certify that all the documents authenticated here are under the Seal of the Secretary of State and are in support of the request for the surrender of Isac Alejandro Calderon.

**Priya Badhan**
Extradition Section
UK Central Authority
Home Office

7th June 2024

# THE EXTRADITION

# OF

# ISAC ALEJANDRO CALDERON

# FROM

# THE UNITED STATES OF AMERICA

# THE EXTRADITION

# OF

# ISAC ALEJANDRO CALDERON

# FROM

# THE UNITED STATES OF AMERICA

# SUPPLEMENTARY DEPOSITION

Exhibit KML/1 – Section 1A of the Road Traffic Act 1988          1-5

Kate Leonard states as follows:-

I am a Barrister and Specialist Extradition Prosecutor with the Crown Prosecution Service of England and Wales. I am the lawyer responsible for the extradition request in respect of Isac Alejandro Calderon from the United States of America.

This deposition is supplementary to my deposition submitted on 13 March 2024. The purpose of this supplementary deposition is to formally produce the statute setting out the law relating to section 1A of the Road Traffic Act 1988. Mr Calderon's extradition is sought for an offence contrary to that section. The relevant provision is attached, and I produce this as my exhibit KML/1.

Signed: K.M. Leonard......*K.M. Leonard*..........................................  KATE LEONARD

Dated: ...06/06/2024.............................................

*Changes to legislation: Road Traffic Act 1988, Section 1A is up to date with all changes known to be in force on or before 20 May 2024. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes*



# Road Traffic Act 1988

### 1988 CHAPTER 52

PART I

PRINCIPAL ROAD SAFETY PROVISIONS

*Driving offences*

[^F1^1A   **Causing serious injury by dangerous driving**

(1) A person who causes serious injury to another person by driving a mechanically propelled vehicle dangerously on a road or other public place is guilty of an offence.

(2) In this section "serious injury" means—

 (a)   in England and Wales, physical harm which amounts to grievous bodily harm for the purposes of the Offences against the Person Act 1861, and

 (b)   in Scotland, severe physical injury.]

---

**Textual Amendments**

F1   S. 1A inserted (3.12.2012) by Legal Aid, Sentencing and Punishment of Offenders Act 2012 (c. 10), ss. 143(2), 151(1) (with s. 143(4)); S.I. 2012/2770, art. 2(b)

EXT-CALDERON-00063

1

**Changes to legislation:**
Road Traffic Act 1988, Section 1A is up to date with all changes known to be in force on or before 20 May 2024. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations.
View outstanding changes

**Changes and effects yet to be applied to the whole Act associated Parts and Chapters:**
Whole provisions yet to be inserted into this Act (including any effects on those provisions):

— s. 34A inserted by 2000 c. 37 Sch. 7 para. 6 (This amendment not applied to legislation.gov.uk. The amending provision has been repealed)
— s. 41(2)(m) inserted by 2006 c. 49 s. 18(1)(a)
— s. 41(2)(ba) inserted by 2006 c. 49 s. 56(3)
— s. 49(3A) inserted by 2006 c. 49 s. 48(1)
— s. 66(7A) inserted by 2006 c. 49 s. 56(5)
— s. 85(1) words omitted (temp.) by S.I. 2019/648 reg. 2(5)(a) (This amendment not applied to legislation.gov.uk. Reg. 2(5)(a) substituted (1.9.2020) by S.I. 2020/818, regs. 1(b), Sch. 6 para. 39(2)(c)(i)))
— s. 85(1) words omitted (temp.) by S.I. 2019/648 reg. 2(5)(d) (This amendment not applied to legislation.gov.uk. Reg. 2(5)(a) substituted (1.9.2020) by S.I. 2020/818, regs. 1(b), Sch. 6 para. 39(2)(c)(ii)))
— s. 85(2) added by 1988 c. 54 Sch. 2 para. 17(c)
— s. 97(1)(c)(ia) words repealed by 2006 c. 49 Sch. 3 para. 6(2)(b)Sch. 7(4)
— s. 97(1)(d)(ii) words omitted by S.I. 2018/1251 reg. 2(4)
— s. 97(1ZA) inserted by 2006 c. 49 s. 38(2)
— s. 108(1BA) inserted by S.I. 2018/1251 reg. 2(5)(c)
— s. 123123A substituted for s. 123 by 2006 c. 49 Sch. 6 para. 2
— s. 123A(3) words inserted by 2009 c. 17 s. 1(3)
— s. 124(3)-(5) inserted by 2009 c. 17 s. 3
— s. 124(6) inserted by 2015 c. 20 Sch. 2 para. 2(b) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
— s. 125(3A)-(3D) inserted by 2015 c. 20 Sch. 2 para. 3(2) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
— s. 125(5A) inserted by 2015 c. 20 Sch. 2 para. 3(3) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
— s. 125A(5)-(7E) substituted for s. 125A(5)-(7) by 2006 c. 49 Sch. 6 para. 6(3)
— s. 125ZA inserted by 2006 c. 49 Sch. 6 para. 5
— s. 125ZA(2)(b) word omitted by 2015 c. 20 Sch. 2 para. 4(2)(a) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
— s. 125ZA(2)(d) and word inserted by 2015 c. 20 Sch. 2 para. 4(2)(b) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
— s. 125ZA(4)(c) word omitted by 2015 c. 20 Sch. 2 para. 4(3)(c) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
— s. 125ZA(4)(c) words substituted by 2015 c. 20 Sch. 2 para. 4(3)(b) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
— s. 125ZA(4)(ba)(bb) inserted by 2015 c. 20 Sch. 2 para. 4(3)(a) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)

- s. 125ZA(4)(ca) inserted by 2015 c. 20 Sch. 2 para. 4(3)(d) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
- s. 126(5) omitted by 2015 c. 20 Sch. 2 para. 6 (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
- s. 126A inserted by 2016 c. 16 s. 1(3)
- s. 126A omitted (cond.) by 2006 c. 49 Sch. 6 para. 8A (as inserted) by 2016 c. 16 s. 3(3)
- s. 126A heading words inserted by S.I. 2016/1089 reg. 3(2) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 126A(1) words inserted by S.I. 2016/1089 reg. 3(3)(a) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 126A(1) words inserted by S.I. 2016/1089 reg. 3(3)(b) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 128A inserted by 2006 c. 49 Sch. 6 para. 11
- s. 128A(4) inserted by 2006 c. 49 Sch. 6 para. 11 (as inserted) by 2016 c. 16 s. 4(4)
- s. 128B inserted by 2015 c. 20 Sch. 2 para. 9 (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
- s. 128ZA inserted by 2009 c. 17 s. 1(1)
- s. 128ZB inserted by 2009 c. 17 s. 2
- s. 128AZA128AZB inserted by 2016 c. 16 s. 2(2)
- s. 128AZA128AZB inserted (cond.) by 2006 c. 49 Sch. 6 para. 10A (as inserted) by 2016 c. 16 s. 4(2)
- s. 128AZA128AZB substituted (cond.) by 2006 c. 49 Sch. 6 para. 10A (as inserted) by 2016 c. 16 s. 4(2)
- s. 128AZA heading words inserted by S.I. 2016/1089 reg. 4(2)(a) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 128AZA(1) words inserted by S.I. 2016/1089 reg. 4(2)(b) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 128AZA(4) words inserted by S.I. 2016/1089 reg. 4(2)(c) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 128AZB heading words inserted by S.I. 2016/1089 reg. 4(3)(a) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 128AZB(1) words inserted by S.I. 2016/1089 reg. 4(3)(b)(i) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 128AZB(1) words inserted by S.I. 2016/1089 reg. 4(3)(b)(ii) (This amendment not applied to legislation.gov.uk. Regs. 3, 4 omitted (1.12.2023) without ever being in force by virtue of S.I. 2023/1286, regs. 1, 7(3))
- s. 131(A1)-(C1) inserted by 2006 c. 49, Sch. 6 para. 13(1A) (as inserted) by S.I. 2023/1286 Sch. 3 para. 92(2)(a)(i)
- s. 131(3)(b)(c) substituted for s. 131(3)(b) and word by 2006 c. 49 Sch. 6 para. 13(4)
- s. 131(6) inserted by 2016 c. 16 s. 2(4)
- s. 131(6) inserted by 2006 c. 49 Sch. 6 para. 13(9) (as inserted) by 2016 c. 16 s. 4(5)
- s. 131(6) substituted by 2006 c. 49 Sch. 6 para. 13(9) (as inserted) by 2016 c. 16 s. 4(5)
- s. 132-133ZA and cross-heading substituted for ss. 132, 133 and cross-heading by 2006 c. 49 Sch. 6 para. 14

- s. 133(2)(a) words omitted by 2015 c. 20 Sch. 2 para. 10(a) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
- s. 133(2)(b) words omitted by 2015 c. 20 Sch. 2 para. 10(b) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
- s. 133D(1A) inserted by 2015 c. 20 Sch. 2 para. 14(2) (This amendment is to Part 5 of the Road Traffic Act 1988 as amended by Schedule 6 to the Road Safety Act 2006. Those amendments have not yet come into force)
- s. 140(1)(2) inserted by 2006 c. 49 Sch. 6 para. 23(2)
- s. 140(1A) inserted in earlier affecting provision 2006 c. 49, Sch. 6 para. 23(2) by S.I. 2023/1286 Sch. 3 para. 92(2)(b)
- s. 140(3) s. 140 renumbered as s. 140(3) by 2006 c. 49 Sch. 6 para. 23(1)
- s. 141A(5) words repealed by 2006 c. 49 Sch. 3 para. 24Sch. 7(4)
- s. 143(1A) repealed (cond.) by S.I. 2019/1047 Sch. 2 para. 2 (This amendment not applied to legislation.gov.uk. The insertion of s. 143(1A) by 2018 c. 18, Sch. para. 17 was repealed (1.11.2019) by The Motor Vehicles (Compulsory Insurance) (Miscellaneous Amendments) Regulations 2019 (S.I. 2019/1047), reg. 1, Sch. 2 para. 1 (with reg. 5) without ever being brought into force.)
- s. 173(2)(g)-(gb) substituted for s. 173(2)(g) by 2006 c. 49 Sch. 6 para. 27
- s. 173(2)(n) and word inserted by 2006 c. 49 s. 37(8)
- s. 174(1)(da) inserted by 2006 c. 49 Sch. 6 para. 28
- s. 183(6A) inserted by 2006 c. 49 Sch. 6 para. 29

# Causing serious injury by dangerous driving

Road Traffic Act 1988, s.1A

**Guideline effective from: 01 July 2023**

Triable either way
Maximum: 5 years' custody
Offence range: 26 weeks – 5 years' custody

Obligatory disqualification: minimum 2 years with compulsory extended re-test