UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| IN THE MATTER OF ) | |
| ) | |
| THE EXTRADITION OF ) | Misc. No. |
| ) | |
| ISAC ALEJANDRO CALDERON ) | |

**MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty[1] obligations to the United Kingdom of Great Britain and Northern Ireland (the "United Kingdom"), and acting at the request of United Kingdom, respectfully requests that the fugitive in this case, Isac Alejandro CALDERON ("CALDERON"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why CALDERON should be detained. In short, CALDERON should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he is not a flight risk, that he is not a danger to the community, and that special circumstances exist warranting his release.

**BACKGROUND**

The United Kingdom seeks the extradition, of CALDERON so that he may be prosecuted for causing serious injury by dangerous driving in violation of Section 1A of the

---

[1] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC NO. 108-23 (2004) (the "2003 Treaty"), *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

Road Traffic Act of 1988 and Schedule 2 of the United Kingdom's Road Traffic Offender's Act of 1988. On December 1, 2023, District Judge Strongman of Kidderminster Magistrates Court issued a warrant for CALDERON's arrest. The extradition request presents the following facts, among others, as the basis for United Kingdom's request:

On July 31, 2023, at approximately 7:50 p.m., CALDERON was driving a silver Honda Accord on the A4103 road, a fifty mile per hour road in Shucknall, Herefordshire, United Kingdom. Multiple eyewitnesses observed CALDERON dangerously overtaking several vehicles at high speed before crossing the solid white lines marking a no passing zone and which separated opposing lanes of traffic at a right-hand bend in the road, resulting in a head-on collision with a vehicle driven by Elizabeth Donowho ("the victim").

The victim provided a statement describing the collision. She explained that at the time of the collision, visibility was clear, and it was still daylight. The weather was dry, and there were no other cars immediately in front or behind her, when suddenly, CALDERON's car appeared driving towards her in her lane of traffic. She had no time to react before CALDERON's vehicle struck her head-on, and she briefly lost consciousness upon impact. She later managed to regain consciousness and get out of the vehicle before she was transported to the hospital for treatment for her injuries.

As a result of the collision, the victim suffered serious injuries, including fractures to both of her ankles, her sternum, and her hand. The victim was hospitalized for two weeks and was unable to walk for six weeks. Her mobility remains poor, and she has been told a full recovery is not possible. As a result of the collision and her injuries, she is experiencing ongoing mental health issues, including anxiety about driving and leaving her house, as well as nightmares and

flashbacks. She has been unable to return to her job as a nurse, and she is unsure whether she will ever be able to do so.

Police conducted various interviews with other drivers who were driving on A4103 at the time of the collision. One driver, Nazeem Hussain ("Hussain"), stated that he witnessed a silver vehicle pass him on a bend at approximately sixty miles per hour in a fifty mile per hour zone. The driver of the silver vehicle thereafter lost control of his car and hit another vehicle. Hussain's vehicle was fitted with a dashcam, the footage from which he provided to U.K. authorities, and which clearly captures the collision.

A second driver, Emily McDermot ("McDermot"), did not witness the collision, but observed CALDERON driving dangerously prior to the collision. McDermot explained that she was traveling on the A4103 when a silver vehicle passed her at the top of a hill. McDermot estimated the vehicle was traveling at approximately seventy miles per hour when it passed her. McDermot then witnessed the silver car pass a small blue Fiat 500, narrowly avoiding a head on collision with an oncoming vehicle, before the silver car disappeared around a bend in the road.

A third driver, Suzette Jones ("Jones"), similarly described a silver vehicle passing her car on a bend at high speed and narrowly missing a collision with a car traveling in the opposite direction. Jones stated that she saw the silver vehicle a few minutes later turned on its side in a hedge after apparently colliding with another vehicle.

On August 15, 2023, PC Watkins interviewed CALDERON in the presence of an assigned legal representative. CALDERON explained that he was in the United Kingdom for work, but at the time of collision, he was not working and instead was traveling to engage in personal activities. He further admitted that he was the driver of the silver Honda Accord that was involved in the

collision. CALDERON claimed not to have any recollection of the crash because he lost consciousness. He also admitted that he had only obtained the silver Honda six days before to the collision and although the vehicle had a manual gearbox, he had no prior experience driving a vehicle with a manual transmission. CALDERON further explained that he had been driving a car in the United Kingdom since April 2023, utilizing rental cars before he obtained the silver Honda. Nevertheless, he claimed he was "not at all" familiar with road markings and traffic directions in the United Kingdom, and he did not know that the solid white lines on the road marked a no passing zone. When confronted with dashcam footage of the collision, CALDERON exclaimed "shit" and explained that he "wouldn't have called [his driving] dangerous" but based on the images depicted in the dashcam footage, "[he had] no other way to describe it . . . " When PC Watkins asked for CALDERON's thoughts on his driving after seeing the dashcam footage, CALDERON responded that his driving "was definitely not safe."

PC Wakins informed CALDERON that he would be facing charges for causing serious injury by dangerous driving and asked him if he had plans to leave the country. CALDERON assured PC Watkins that he was remaining in the United Kingdom until March 2024. On November 25, 2023, CALDERON left the United Kingdom.

The United Kingdom sought CALDERON's extradition, pursuant to the Treaty. The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181, *et seq.*, filed a complaint in this District seeking a warrant for CALDERON's arrest. This Court issued the arrest warrant, and CALDERON was arrested on this extradition matter on Sunday, July 14, 2024. CALDERON is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

I. **LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS**

    A. **The limited role of the Court in extradition proceedings**

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State (the "Secretary") that the evidence the requesting country has provided is "sufficient to sustain the charge." 18 U.S.C. § 3184. The Secretary, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F. 2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs.").

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements to certify extraditability—as defined in the applicable extradition treaty, statutes, and case law— have been established. *See Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993). If the Court finds that the requirements for certification are satisfied, it must provide the certification to the Secretary, together with a copy of any testimony taken before the Court and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

### B. The requirements for certification

A court should certify to the Secretary that a fugitive is extraditable when the following requirements have been met: (1) The judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the treaty covers each offense for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to each offense for which extradition is requested. *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *In re Extradition of Hurtado*, 2013 WL 4515939, at *2 (Aug. 21, 2013 W.D. Tx.); *Ordinola v. Hackman*, 478 F. 3d 588, 608 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007). The following sections briefly discuss each of those requirements.

#### 1. Authority over the proceedings

The extradition statute authorizes "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State" to conduct extradition proceedings. 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. S*ee Jimenez v. Aristeguieta*, 311 F. 2d 547, 553–55 (5th Cir. 1962) (any judicial officer in class authorized by statute may conduct extradition hearing); *Austin v. Healey*, 5 F. 3d 598, 601–02 (2d Cir. 1993) (finding magistrate judge authorized to conduct extradition hearing without specific delegation

6

of authority); *Ward v. Rutherford*, 921 F. 2d 286, 287 (D.C. Cir. 1990) (finding that statute and local rule made plain magistrate judge's authority to conduct extradition hearing).

        2.        <u>Jurisdiction over the fugitive</u>

The Court has jurisdiction over a fugitive, such as CALDERON, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

        3.        <u>Treaty in full force and effect</u>

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See, e.g.*, *In re Chan Kam-Shu*, 477 F. 2d 333 (5th Cir. 1973), *cert. denied*, 414 U.S. 847 (1973); *Hoxha v. Levi*, 465 F. 3d 554, 562 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F. 3d 165, 171 (3d Cir. 1997). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and the United Kingdom. The State Department's conclusion that the Treaty is in full force and effect, as expressed in this declaration, is entitled to deference. *See, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with

7

their negotiation and enforcement is given great weight").

### 4. Crime covered by the Treaty

An extradition treaty creates an obligation for the United States to surrender fugitives under the circumstances the treaty defines. Article I of the Treaty provides for the return of fugitives charged with, or convicted of, an "extraditable offense," as that term is defined under the Treaty. Article II of the Treaty defines an offense as extraditable if the criminal conduct is punishable under the laws of both the United States and the United Kingdom by "deprivation of liberty for at least one year or more or by a more severe penalty.[2]"

Consequently, in assessing whether the crimes for which extradition is requested are covered by the Treaty, the Court should examine the description of criminal conduct provided by the United Kingdom in support of its charges and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Wright v. Henkel*, 190 U.S. 40, 61 (1903); *In re Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989). "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the *particular act* charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922) (emphasis added). A requesting country need not establish that its crimes are identical to ours. *See United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995) ("The principle of dual

---

[2] Article 2.5 of the Treaty further provides that, if extradition is granted for an extraditable offense, it may also be granted for requested offenses that are punishable by less than one year of confinement so long as all other requirements for extradition are met.

criminality does not demand that the laws of the surrendering and requesting states be carbon copies of one another."). Rather, "[d]ual criminality requires that an accused be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." *In re Gambino*, 421 F. Supp. 2d 283, 306 (D. Mass. 2006) (quotation omitted).

In fulfilling its function under Section 3184, the Court should construe liberally the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 298–300 (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

     5.     <u>Probable cause that the fugitive has committed the offense</u>

To certify the evidence to the Secretary, the Court must conclude that probable cause exists to believe that the person before it committed the crimes for which the United Kingdom seeks extradition. *See Escobedo*, 623 F. 2d at 1102 & 1105. Probable cause exists if "there is evidence sufficient to show reasonable ground to believe the accused guilty." *Sayne v. Shipley*, 418 F. 2d 679, 685 (5th Cir. 1969); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an

offense.") (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted); *see Haxhiaj v. Hackman*, 528 F. 3d 282, 287 (4th Cir. 2008) ("The extradition hearing is not to serve as a full-blown trial and serves simply to permit a limited inquiry into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country.") (internal quotation marks omitted); *Hoxha*, 465 F. 3d at 561 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.").

    **C.    An extradition hearing follows unique procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828.

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). Likewise,

a fugitive has no right to discovery. *See, e.g.*, *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).

The fugitive's right to present evidence is severely constrained, and many constitutional protections applicable in criminal cases do not apply. For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing or to confront his accusers, *see Ordinola*, 478 F.3d at 608; *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); and no Sixth Amendment right to a speedy extradition, *see McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Martin*, 993 F.2d at 829; *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978). The exclusionary rule is inapplicable, *see Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980); and the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see Collins*, 262 U.S. at 429; *In re Extradition of McMullen*, 989 F.2d 603, 612–13 (2d Cir. 1993), *cert. denied*, 510 U.S. 913 (1993).

Hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extradition may be, and usually is, based entirely on the authenticated documentary evidence and information the requesting government has provided. *See Bingham*, 241 U.S. at 517 (stating that requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty"); *Haxhiaj*, 528 F.3d at 292 ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination.") (citations omitted).

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence the government submits on behalf of the

11

country seeking extradition; rather, the fugitive may introduce only evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461–62 (1913); *Garza v. United States*, 180 F. App'x 522, 523 (5th Cir. 2006) ("Evidence contradicting the Government's evidence is not permitted at an extradition hearing, so as to avoid a trial of guilt or innocence.") (citing *Collins*, 259 U.S. at 316–17; *Sayne*, 418 F.2d at 685); *In re Extradition of Ramos Herrera*, 268 F. Supp. 2d 688, 696 (W.D. Tex. 2003) (noting that extradition judges "are not expected to decide conflicting factual claims between the [requesting state] and the accused").[3] A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

## D. Rule of non-inquiry: all matters other than certification are reserved for the Secretary of State

All matters a fugitive might raise as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary, not the Court. *See* 18

---

[3] The extent to which a fugitive may offer explanatory proof is largely within the court's discretion. *See Koskotas*, 931 F.2d at 175; *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978); *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), *cert. denied*, 376 U.S. 952 (1964) (citing cases).

U.S.C. §§ 3184, 3186. For example, the Secretary should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *See Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the Department of State.") (citation omitted). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Escobedo*, 623 F.2d at 1105. This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II. CALDERON SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, applies only to "offenses" against the United States that are triable in U.S. courts, and does not apply to international extradition proceedings. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2); *United States v. Risner*, No. 3:18-MJ-765-BN, 2018 WL 6809796, at *5 (N.D. Tex. Dec. 27, 2018).[4] Unlike in domestic criminal cases, "there is no presumption

---

[4] The term "offense" for the purposes of Section 3141 is defined in 18 U.S.C. § 3156(a)(2) as "any criminal offense, other than an offense triable by court-martial, military commission, provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress . . . ." CALDERON is not charged with an "offense" within the meaning of 18 U.S.C. § 3156 but, rather, with offenses committed in violation of the laws of the United Kingdom.

13

favoring bail" in extradition cases. *In re Extradition of Russell*, 805 F.2d 1215, 1216 (5th Cir. 1986). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

    **A.**    **Applicable law**

        1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

This presumption against bail in international extradition proceedings is rooted in *Wright v. Henkel*, 190 U.S. 40 (1903), where the Supreme Court explained that, when a foreign government makes a proper request under a valid extradition treaty, the United States is obligated to deliver the fugitive:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

*Id.* at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. Where, as here, the Government of the United Kingdom meets the conditions of the Treaty, the United States is obliged to deliver the fugitive. It is important that the United States be regarded in the international community as a country that honors its agreements, in order to be in a position to demand that other nations meet their reciprocal

14

obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See id.*; *see also Leitner*, 784 F.2d at 160–61 (the Government has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave the United Kingdom without either remedy or compensation.

> 2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

Given the strong presumption against bail, a fugitive may not be released on bail unless he demonstrates that (1) he is neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant his release. *See, e.g.*, *Russell*, 805 F.2d at 1216; *United States v. Ramnath*, 533 F. Supp. 2d 662, 665 (E.D. Tex. 2008); *Risner*, 2018 WL 6809796, at *6.[5] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to

---

[5] "[T]here is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy . . . . [Some] courts require the person subject to international extradition to overcome the presumption against bail by presenting clear and convincing evidence that bail is warranted. . . [and t]here is a negligible minority of courts that have adopted a preponderance of the evidence standard." *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 481 (S.D. Tex. 2010).

flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering that fugitive, a physician, had "more than sufficient assets available with which to flee").

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989) (flight risk "is not the criteria for release in an extradition case"); *Ramnath*, 533 F. Supp. 2d at 666; *but see Garcia*, 761 F. Supp. 2d at 473 ("[W]hether the test to grant bail in foreign extradition cases is a two-pronged analysis, or whether risk of flight is considered as part of the 'special circumstances' inquiry, remains uncertain in the Fifth Circuit."). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno*, 878 F.2d at 317–18 (lack of flight risk "is not the criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.

Where a fugitive claims special circumstances, "courts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot

16

involve factors applicable to all potential extraditees." *Garcia*, 761 F. Supp. 2d at 472. Courts have considered and rejected a lengthy list of would-be special circumstances – among them:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *In re Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992); *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *Risner*, 2018 WL 6809796, at *22; *Beresford-Redman*, 753 F. Supp. 2d at 1089;

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160–61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3–4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Huerta*, No. H–08–342M, 2008 WL 2557514, at *2 (S. D. Tex. June 23, 2008); *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1301–02 (S.D. Fla. July 7, 2017); *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004); *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 173–74 (S.D.N.Y. 2009); *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1992); *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 602 (W.D. Va. 2013); *In re Extradition of Rouvier*, 839 F. Supp. 537, 541–42 (N.D. Ill. 1993);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 17-cv-00861, 2017 WL 1197855, at *3 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Knotek*, No. 13-9204 BRO, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. July 3, 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3–4 (allegedly well-respected businessman); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 131 (E.D.N.Y. Mar. 21, 2001); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581–82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297–98; *Antonowicz*, 2017 WL 1197855, at *3; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 2017 WL 1197855, at *3; *Garcia*, 615 F. Supp. 2d at 172; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1386–87 (D. Nev. May 24, 1995).

While in certain exceptional cases, some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

**B.    Analysis**

The Court should detain CALDERON without bond because he is a danger to the community and a flight risk and because no special circumstances warrant his release.

*First*, the serious nature of the dangerous driving offense with which CALDERON is charged renders him a danger to the community both here in the United States and abroad if he were released from custody. *See, e.g.*, *In re Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *3 (C.D. Cal. Mar. 7, 2016) (seriousness of allegations against fugitive "militates against release on bail"). This dangerousness renders bail inappropriate.

*Second*, CALDERON is a flight risk. Given the strength of the case in the United Kingdom and the Government's relatively low burden of proof in extradition hearings, CALDERON has no incentive to appear at his extradition hearing. *See, e.g.*, *Garcia*, 761 F. Supp. 2d at 483 ("The Court believes that [fugitive]'s risk of flight is beyond a 'tolerable risk.' He has virtually no incentive to appear at his extradition hearing, where, due to the

18

Government's low burden of proof, there are significant risks that he will be formally extradited . . . ."); *In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally definition, in flight or deliberately absent from that jurisdiction). *See United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad*, 536 F.2d at 483). Moreover, CALDERON has already demonstrated his intent to evade prosecution in this case. When he was interviewed by police in the United Kingdom, PC Watkins informed CALDERON that criminal charges were being pursued against him and asked him if he planned on remaining in the United Kingdom. CALDERON stated that he had no plans to leave the country until March 2024. U.K authorities subsequently sent a summons to CALDERON's address in the United Kingdom, instructing him to appear in court on the charges on December 1, 2023. Despite his prior statements to PC Watkins, CALDERON fled the United Kingdom on November 25, 2023, one week before his scheduled court appearance. Accordingly, allowance of bail in any amount would not guarantee CALDERON's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

These reasons alone warrant denying any forthcoming application for bail. However, even if the Court were satisfied that CALDERON is not a flight risk or danger to the community,

the Government is unaware of any "special circumstances" that would justify bail in this case. *Cf. In re Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated).

## **CONCLUSION**

For the foregoing reasons, the United States requests that CALDERON be detained pending resolution of this extradition proceeding.[6]

Dated: July 15, 2024

Respectfully submitted,

ALAMDAR S. HAMDANI
United States Attorney

By: /s/ Jay Hileman
Jay Hileman
Assistant United States Attorney

---

[6] Should, however, the Court be inclined to grant bail in this case, the Government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the United Kingdom, the Government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order so that the United States can consider the matter of whether, under the circumstances, to seek a stay pending possible appeal on the bail issue.