UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

IN THE MATTER OF                        )
                                        )
THE EXTRADITION OF                      )        Misc. No.
                                        )
ISAC ALEJANDRO CALDERON                 )

<u>GOVERNMENT'S RESPONSE TO CALDERON'S MOTION FOR DISCOVERY, BOND,
AND TO DISMISS THE EXTRADITION COMPLAINT</u>

The United States, in fulfilling its treaty obligations to the United Kingdom of Great

Britain and Northern Ireland (the "United Kingdom"), hereby submits its response to the

Opposed Motion for Discovery, Bond, and to Dismiss the Extradition Complaint filed by Isac

Alejandro CALDERON ("CALDERON").  The Court has scheduled an extradition hearing and

a hearing on bail for Monday, July 29, 2024.

CALDERON filed an Opposed Motion for Discovery, Bond and to Dismiss the

Extradition Complaint at Document 14.  He argues that the extradition complaint should be

dismissed because there is no dual criminality, and no charging document was provided by the

requesting country. He additionally asks the Court to compel discovery and asserts that he should

be released on bail.  CALDERON's arguments are without merit and the United States asks that

these requests be denied.  First, because CALDERON's conduct would constitute aggravated

assault under Texas law, the dual criminality requirement has been satisfied.  Second, under the

terms of the applicable treaty no charging document is required.  Third, CALDERON's motion

for discovery should be denied because (1) the government has already produced all materials

relevant to this Court's extraditability determination in its custody and control and the Court has

no power to compel the United Kingdom to produce additional materials.  Fourth, release from

detention would be inappropriate in this case where CALDERON remains a serious flight risk and he has not demonstrated special circumstances justifying his release.

## INTRODUCTION

In this case, the government seeks certification of CALDERONS's extradition pursuant to a request submitted by the United Kingdom under the Extradition Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland[1] (the "Treaty") and 18 U.S.C. §§ 3184 *et seq.* The United Kingdom is seeking CALDERON's extradition so that he may prosecuted for causing serious injury by dangerous driving in violation of Section 1A of the Road Traffic Act of 1988 and Schedule 2 of the United Kingdom's Road Traffic Offenders Act of 1988.

The Court must certify a fugitive as extraditable where, *inter alia*, the crimes for which extradition is requested are covered by the applicable treaty and there is sufficient evidence to support a finding of probable cause as to each charge. *See, e.g.*, *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008); *In re Extradition of Vargas*, 978 F. Supp. 2d 734, 744 (S.D. Tex. 2013). For the reasons set forth herein, the evidence submitted by the United Kingdom fulfils the Treaty requirements and is more than "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. The Court should therefore certify

---

[1] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC NO. 108-23 (2004) (the "2003 Treaty"), *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

CALDERON's extradition to the Secretary of State, who will decide whether to surrender CALDERON "according to the treaty."[2]  *Id.*

## **BACKGROUND**

The United Kingdom seeks the extradition, of CALDERON so that he may be prosecuted for causing serious injury by dangerous driving in violation of Section 1A of the Road Traffic Act of 1988 and Schedule 2 of the United Kingdom's Road Traffic Offender's Act of 1988.  On December 1, 2023, District Judge Strongman of Kidderminster Magistrates Court issued a warrant for CALDERON's arrest.  The extradition request presents the following facts, among others, as the basis for United Kingdom's request:

On July 31, 2023, at approximately 7:50 p.m., CALDERON was driving a silver Honda Accord on the A4103 road, a fifty mile per hour road in Shucknall, Herefordshire, United Kingdom.  Multiple eyewitnesses observed CALDERON dangerously overtaking several vehicles at high speed before crossing the solid white lines marking a no passing zone and which separated opposing lanes of traffic at a right-hand bend in the road, resulting in a head-on collision with a vehicle driven by Elizabeth Donowho ("the victim").

The victim provided a statement describing the collision.  She explained that at the time of the collision, visibility was clear, and it was still daylight.  The weather was dry, and there were no other cars immediately in front or behind her, when suddenly, CALDERON's car appeared

---

[2]      After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender."  *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993).  "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not."  *Id.*

driving towards her in her lane of traffic.  She had no time to react before CALDERON's vehicle struck her head-on, and she briefly lost consciousness upon impact.  She later managed to regain consciousness and get out of the vehicle before she was transported to the hospital for treatment for her injuries.

As a result of the collision, the victim suffered serious injuries, including fractures to both of her ankles, her sternum, and her hand.  The victim was hospitalized for two weeks and was unable to walk for six weeks.  Her mobility remains poor, and she has been told a full recovery is not possible.  As a result of the collision and her injuries, she is experiencing ongoing mental health issues, including anxiety about driving and leaving her house, as well as nightmares and flashbacks.  She has been unable to return to her job as a nurse, and she is unsure whether she will ever be able to do so.

Police conducted various interviews with other drivers who were driving on A4103 at the time of the collision. One driver, Nazeem Hussain ("Hussain"), stated that he witnessed a silver vehicle pass him on a bend at approximately sixty miles per hour in a fifty mile per hour zone. The driver of the silver vehicle thereafter lost control of his car and hit another vehicle.

Hussain's vehicle was fitted with a dashcam, the footage from which he provided to U.K. authorities, and which clearly captures the collision.  The officer who viewed this dashcam footage explained that it shows CALDERON illegally passing Hussain's car on a right bend in the road. In addition to the double white line in the center of the road the word "SLOW" is painted on the surface of the road, and a sign directing drivers to return to their lane of traffic before the bend is visible.  After passing Hussain's car, CALDERON can be seen swerving back into the correct lane

of traffic, at which point he appears to lose control of his vehicle, cross the center lane again, a collide with the victim's car.

A second driver, Emily McDermot ("McDermot"), did not witness the collision, but observed CALDERON driving dangerously prior to the collision. McDermot explained that she was traveling on the A4103 when a silver vehicle passed her at the top of a hill. McDermot estimated the vehicle was traveling at approximately seventy miles per hour when it passed her. McDermot then witnessed the silver car pass a small blue Fiat 500, narrowly avoiding a head on collision with an oncoming vehicle, before the silver car disappeared around a bend in the road.

A third driver, Suzette Jones ("Jones"), similarly described a silver vehicle passing her car on a bend at high speed and narrowly missing a collision with a car traveling in the opposite direction. Jones stated that she saw the silver vehicle a few minutes later turned on its side in a hedge after apparently colliding with another vehicle.

On August 15, 2023, PC Watkins interviewed CALDERON in the presence of an assigned legal representative. CALDERON explained that he was in the United Kingdom for work, but at the time of collision, he was not working and instead was traveling to engage in personal activities. He further admitted that he was the driver of the silver Honda Accord that was involved in the collision. CALDERON claimed not to have any recollection of the crash because he lost consciousness. He also admitted that he had only obtained the silver Honda six days before to the collision and although the vehicle had a manual gearbox, he had no prior experience driving a vehicle with a manual transmission. CALDERON further explained that he had been driving a car in the United Kingdom since April 2023, utilizing rental cars before he obtained the silver Honda. Nevertheless, he claimed he was "not at all" familiar with road markings and traffic directions in

the United Kingdom, and he did not know that the solid white lines on the road marked a no passing zone. When confronted with dashcam footage of the collision, CALDERON exclaimed "shit" and explained that he "wouldn't have called [his driving] dangerous" but based on the images depicted in the dashcam footage, "[he had] no other way to describe it . . . " When PC Watkins asked for CALDERON's thoughts on his driving after seeing the dashcam footage, CALDERON responded that his driving "was definitely not safe."

PC Wakins informed CALDERON that he would be facing charges for causing serious injury by dangerous driving and asked him if he had plans to leave the country. CALDERON assured PC Watkins that he was remaining in the United Kingdom until March 2024. On November 25, 2023, CALDERON left the United Kingdom.

The United Kingdom sought CALDERON's extradition, pursuant to the Treaty. The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181, *et seq.*, filed a complaint in this District seeking a warrant for CALDERON's arrest. This Court issued the arrest warrant, and CALDERON was arrested on this extradition matter on Sunday, July 14, 2024. CALDERON is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I.   APPLICABLE LAW CONCERNING EXTRADITION PROCEEDINGS

The extradition process is *sui generis*. *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 826 (S.D. Tex. 2011) (internal citations omitted). Extradition is primarily an executive function with the Court playing a defined and limited role. *See Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006). The extradition statutes defining the role of extradition courts establish a two-step process involving a court proceeding that is followed by a determination by the Secretary of

State.  18 U.S.C. § 3181, *et seq*.  Specifically, the Court is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge."  18 U.S.C. § 3184.  Following the Court's certification, the Secretary of State decides whether the person whose extradition is sought should be surrendered to the requesting country.  18 U.S.C. §§ 3184, 3186; *In re United States*, 713 F.2d 105, 108 (5th Cir. 1983).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability – as defined in the applicable extradition treaty, statutes, and case law – have been established.  *See Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (analogizing extradition hearing to a preliminary hearing in a criminal case).  Given their limited scope and purpose, extradition hearings are not governed by the rules applicable to most federal court proceedings.  Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply.  *Kin-Hong*, 110 F.3d at 120; *see also In re Extradition of Garcia*, 825 F. Supp. 2d at 829 ("At the hearing, the Federal Rules of Evidence and the Federal Rules of Criminal Procedure do not apply") (internal citations omitted); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition");  Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of

7

a fugitive").  Unsworn statements of absent witnesses and hearsay may be considered.

*Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011); *Kin–Hong*, 110 F.3d at 120;

*In re Surrender of Ntakirutimana*, No. CIV.A.L-98-43, 1998 WL 655708, at *25 (S.D. Tex.

1998).  Indeed, the government's evidence may consist "entirely of hearsay."  *Kin-Hong*, 110

F.3d at 120; *see Collins v. Loisel*, 259 U.S. 309, 317 (1922).  The fugitive generally has no right

to cross-examine witnesses or introduce contradictory evidence.  *E.g., In re Extradition of*

*Handanovic*, 826 F. Supp. 2d 1237, 1239 (D. Or. 2011); *Yin–Choy v. Robinson*, 858 F.2d 1400,

1406-07 (9th Cir. 1988).  The fugitive also cannot introduce evidence that contradicts the

evidence submitted on behalf of the requesting country; he may only introduce evidence

explaining the submitted evidence.  *See Charlton*, 229 U.S. at 461-62.

　　　　In fulfilling its function under § 3184, the Court should liberally construe the applicable

extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the

requesting country.  *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933); *see also Martinez v.*

*United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity

in extradition treaty must be construed in favor of "facilitat[ing] extradition").  Accordingly,

because extradition treaties should be "interpreted with a view to fulfilling our just obligations to

other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges

to extradition with a view toward finding the offenses within the treaty," *McElvy v. Civiletti*, 523

F. Supp. 42, 48 (S.D. Fla. 1981); *see also In the Matter of the Extradition of Chan Kam-Shu*, 477

F.2d 333, 338 n.9 (5th Cir. 1973) ("Extradition treaties should be construed liberally").

　　　　All matters raised by the fugitive as a defense to extradition, other than those related to

the requirements for certification, are to be considered by the Secretary of State, not by the

Court.  18 U.S.C. §§ 3184, 3186.  For example, it is the Secretary of State's role to address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state are a matter for consideration by the executive branch); *Quinn v. Robinson*, 783 F.2d 776, 789 (9th Cir. 1986) ("the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive").  This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State."  *In re Kaine*, 55 U.S. 103, 110 (1852).

## II.    THE REQUIREMENTS FOR CERTIFICATION HAVE BEEN SATISFIED

The Court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.  *See, e.g.*, *Manta*, 518 F.3d at

9

1140; *In re Extradition of Vargas*, 978 F. Supp. 2d at 744.  All of these requirements have been met in this case.[3]

    *First*, the Court is authorized to conduct this extradition proceeding pursuant to 18 U.S.C. § 3184 (authorizing proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State").

    *Second*, because CALDERON was found within this Court's jurisdictional boundaries, the Court has jurisdiction over him.  *Id.* (a judge "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue his warrant for the apprehension of the person so charged").

    *Third*, as provided in the declaration from Tom Heinemann, Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, there is an extradition treaty in full force and effect between the United States and the United Kingdom.  Gov't Exhibit A at 1.

    *Fourth*, as provided herein, the crime for which extradition is sought – causing serious injury by dangerous driving – is covered by the Treaty.

    *Fifth,* as provided herein, the extradition request contains sufficient evidence to establish probable cause that CALDERON committed the crime for which extradition is sought.

1. **CALDERON's Conduct Constitutes an Extraditable Offense Under the Treaty**

    An extradition treaty creates an obligation for the United States to surrender fugitives under the circumstances the treaty defines.  Article 1 of the Treaty provides for the return of

---

[3] In his motion, CALDERON does not contest that the first three requirements for certification have been satisfied. That is, he does not contest that (1) the Court is authorized to conduct the extradition proceedings, (2) the Court has jurisdiction over CALDERON, (3) the Treaty is in full force and effect.

fugitives charged with, or convicted of, an "extraditable offense," as that term is defined under

the Treaty.  Article 2 of the Treaty defines an offense as extraditable "if the conduct on which the

offense is based is punishable under the laws of both States by deprivation of liberty for at least

one year or more or by a more severe penalty." Treaty, art. 2(1).  Further, an offense is

extraditable offense "whether or not the laws in the Requesting and Requested States place the

offense within the same category of offenses or describe the offense by the same terminology[.]"

Treaty, art. 2(3)(a).  Consequently, in assessing whether the crimes for which extradition is

requested are covered by the Treaty, the Court should examine the description of criminal

conduct provided by the United Kingdom in support of its charges and decide whether that

conduct would be criminal under U.S. federal law, the law of the state in which the hearing is

held, or the law of a preponderance of the states. *See Wright v. Henkel*, 190 U.S. 40, 61 (1903);

*In re Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989).  "The law does not require that the

name by which the crime is described in the two countries shall be the same; nor that the scope

of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is

enough if the *particular act* charged is criminal in both jurisdictions."  *Collins v. Loisel*, 259 U.S.

309, 312 (1922) (emphasis added).  A requesting country need not establish that its crimes are

identical to ours.  *See United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995) ("The

principle of dual criminality does not demand that the laws of the surrendering and requesting

states be carbon copies of one another.").  Rather, "[d]ual criminality requires that an accused be

extradited only if the alleged criminal conduct is considered criminal under the laws of both the

surrendering and requesting nations."  *In re Gambino*, 421 F. Supp. 2d 283, 306 (D. Mass. 2006)

(quotation omitted).  Accordingly, CALDERON's assertion that there is no dual criminality

because the U.K. offense of causing serious injury by dangerous driving requires a lower burden of proof than Aggravated Assault under Texas law is misplaced.  As described above, the U.K. offense need not be identical to the Texas offense to satisfy dual criminality.  Instead, it is CALDERON's *conduct* that is relevant for assessing whether dual criminality exists.

Here, CALDERON's conduct if committed in the United States would constitute the felony offense of aggravated assault under Texas Penal Code § 22.02.  Aggravated Assault occurs where a person intentionally, knowingly, or recklessly commits an assault under § 22.01 and 1) causes serious bodily injury to another or 2) uses or exhibits a deadly weapon during the commission of the assault.  Aggravated assault is a second-degree felony punishable by up to twenty years in prison.  The evidence shows that CALDERON's conduct would have constituted aggravated assault under either prong of the statute, had it been committed in the United States. That is, he drove his vehicle in such a manner that would constitute the use of a deadly weapon, and he also caused serious bodily injury to his victim- Elizabeth Donowho.

Texas Penal Code § 1.07(46) defines serious bodily injury as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

Texas Penal Code § 6.03 considers recklessness to be an awareness of but conscious disregard for "a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."

12

A motor vehicle may be a deadly weapon where "the vehicle was intentionally, recklessly or negligently used as a weapon by the accused" *See Nguyen v. State,* 506 S.W.3d 69, 76 (Tex. App. 2016).  A deadly-weapon finding is justified if a rational jury could have concluded that the defendant's vehicle posed an actual danger of death or serious bodily injury. *Sierra v. State*, 280 S.W.3d 250, 254, 256–57 (Tex. Crim. App. 2009).

Texas courts have rejected the idea that a person "must have the specific intent to use an instrument as a deadly weapon" for § 22.02 to apply.  *See Sierra,* 280 S.W.3d at 255 (citing *Walker v. State,* 897 S.W.2d 812 (Tex. Crim. App. 1995)).

Texas Courts have found that conduct similar to CALDERON's to constitute aggravated assault.  The defendant in *Simms* was convicted of aggravated assault with a motor vehicle following a fatal, head-on collision that occurred when the defendant, traveling above the speed limit, crossed the center line on a two-lane road while traveling through a tunnel, and struck a van traveling in the opposite direction.  *See Simms v. State*, 629 S.W.3d. 218, 220 (Tex. Crim App. 2021).   Like CALDERON, the defendant in *Simms* was not known to be under the influence of drugs or alcohol at the time of the collision.  *See id.* at 224. The indictment charged the defendant in *Simms* with recklessly causing the victim serious bodily injury by "failing to control speed, failing to maintain a single lane, or failing to keep a proper lookout," *See id.* at 220, and a jury found him guilty of aggravated assault.  Although the Court of Criminal Appeals of Texas ultimately reversed his conviction and remanded the case on other grounds,[4] it made clear that to be guilty of "aggravated assault as charged, the jury would have had to find that he

---

[4] The court found that the trial court erred in denying the defendant's request for an instruction on the lesser-included-offense of deadly conduct, reversed the judgment, and remanded for a new trial.

was reckless with respect to the result—[the victim's] serious bodily injury—caused by one or more of the alleged manner and means," in that case, by "failing to control speed, failing to maintain a single lane, or failing to maintain a proper lookout."

Similarly, the Court in *Johnson v. State* held that the evidence was legally sufficient to support convictions for aggravated assault where witnesses testified that they saw the defendant's vehicle collide with the victims' car, and witnesses observed  him speeding, weaving in and out of lanes of traffic, cutting in front of other vehicles and pulling up closely behind others, and driving too closely or nearby another 18-wheeler that was also speeding and weaving lane to lane.  *See* Nos. 05-04-01127-CR, 05-04-01128-CR, 05-04-01129-CR, 2006 WL 349496 at *3 (Tex App. 2006).  The defendant in *Johnson* likewise tested negative for drugs and alcohol. *See id.* at *5.

The aggravated assault convictions in *Simms* and *Johnson* are not outliers in Texas.  In fact, Texas case law is replete with examples of aggravated assault convictions being upheld where the defendant caused serious bodily injury to a victim as a result of the defendant's reckless driving.  See *Sanders v. State*, No. 02-18-00539-CR, 2020 WL 5242436 (Tex. App. 2020); *Garcia v. State*, Nos. 04-22-00700-CR, 04-22-00701-CR, 04-22-00705-CR, 04-22-00706-CR, 2024 WL 2732697 (Tex App. 2024).

This well-established line of Texas case law leaves no question that CALDON's conduct, if committed in the United States, would constitute a violation of Texas Penal Code § 22.02.  The extradition request provides ample evidence that CALDERON was driving recklessly at the time of the collision.  Several witnesses described him speeding and dangerously passing vehicles on the A4103 in the minutes immediately preceding the collision.  At one point, CALDERON

14

narrowly avoided a head on collision with another oncoming vehicle when he passed a car at the top of a hill.  Despite this near-miss, dashcam footage shows CALDERON shortly thereafter illegally passing Hussain's car on a blind-curve, in direct violation of road markings and signage that directs drivers to reduce their speed and remain in their lane.  His failure to obey these clear traffic laws resulted in him colliding with the victim's car and causing her serious injury, which included fractures to both her ankles, her sternum, and her hand.   The victim was unable to walk for six weeks, and her mobility remains poor.  By CALDERON's own admissions his driving at the time of the collision "was definitely not safe."  Moreover, based on Texas case law, it is also criminal under Texas Penal Code § 22.02.

Accordingly, the offense for which the United Kingdom requests extradition is covered by the Treaty.

### 2. The Treaty does not Require a Charging Document

Article 8, Section 3(b) of the Treaty requires, *inter alia*, that an extradition shall be supported by "a copy of the warrant or order of arrest issued by a judge or other competent authority" and "a copy of the charging document, *if any* (emphasis added)."  The extradition package from the UK includes a copy of an arrest warrant.  The Treaty does not require that a charging document also be provided to certify extradition.  Instead, the "if any" language contained therein specifically contemplates that there may be situations, like here, where a charging document does not accompany an extradition request.  This treaty language is well-explained by the First Circuit Court of Appeals in *Aguasvivas v. Pompeo*, 984 F.3d 1047 (1st Cir. 2021).  In that case, the Court opined on the permissive nature of identical language in the Extradition Treaty between the United States and Austria. The Court explained that the "if any"

language in the Treaty " . . . grants permission to proceed without that [charging document] if it does not exist."  *See id.* at 1060-61.  Accordingly, a charging document is not required to certify CALDERON as extraditable.

### III.   CALDERON'S REQUEST TO PRODUCE DASHCAM FOOTAGE IS UNNECESSARY TO ASSESS PROBABLE CAUSE

CALDERON's motion for discovery provides no authority on which to grant the requested relief.  The motion requests that the "government produce the best evidence that will assist the court in making the necessary probable cause determination in this matter."  *See* Dkt. 14 at 10.  However, the government has already produced all the responsive documents in its possession, and the United Kingdom is not subject to discovery in this extradition proceeding. Furthermore, the extradition request contains ample evidence to establish probable cause.

As a general rule, relators have no right to discovery.  E.g., *In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 940 (N.D. Ill. 2011).   "Axiomatically, the government cannot be obliged to turn over what it does not possess."  *Matter of Extradition of Ameen*, 378 F. Supp. 3d 902, 913 (E.D. Cal. 2019).  Despite the general rule against discovery, courts retain the discretion and the "inherent power to order … discovery procedures as law and justice require."  *In re Mazur*, No. 6 M 295, 2007 WL 839982, at *6 (N.D. Ill. Mar. 15, 2007).  That is true, as far as it goes.  Courts, however, have also made clear that "any dispute over discovery of items in the possession of the country requesting extradition must be pursued in that country."  *In re Extradition of Handanovic*, 826 F.Supp.2d 1237, 1241 (D. Ore. 2011); *see also*, e.g., *In re Extradition of Zhenly Ye Gon*, 613 F. Supp. 2d 92, 101-02 (D.D.C. 2009) ("the right to discovery could at most extend to the United States itself just as the obligation to produce exculpatory evidence extends

only to the United States, not the demanding state.").   Indeed, no statute, rule of procedure, or relevant treaty provision authorizes federal courts to order sovereign nations to participate in discovery in extradition cases being litigated in the United States.

*In re Extradition of Drayer*, 190 F.3d 410 (6th Cir. 1999) is illustrative.  There, the Sixth Circuit held that, even if the government had an obligation to produce exculpatory documents to the relator, the "obligation does not apply to" the requesting state.  *Drayer*, 190 F.3d at 415. Thus, "to the extent that petitioner's motion for discovery included requests for materials in the possession or control of Canada, it was properly denied." *Id.*  The Sixth Circuit also explained that the U.S. government could not be employed to circumvent that principle.  "The United States does not have any obligation or authority to obtain these materials on behalf of petitioner." *Id.*; *see also Ameen*, 378 F.Supp 3d at 913 (*Brady*, even if applicable in extradition cases, does not require the government to seek "such material that may be in the Republic of Iraq's possession").  Here, like in *Drayer*, "[i]tems that may be in the possession of" the requesting state "must be sought in" that forum.  190 F.3d at 415.

Moreover, even absent the dashcam footage, the authenticated documents submitted by the United Kingdom provides ample evidence of probable cause. Certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government.  *See, e.g., Zanazanian v. United States*, 729 F.2d 624, 629-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-12, 1226-29 (S.D. Cal. 1997) (statements of co-conspirators and other witnesses sufficient in extradition to Mexico); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) (hearsay evidence sufficient in an extradition proceeding).

Indeed, the evidence presented by the requesting country may consist entirely of hearsay.  *See Kin-Hong*, 110 F.3d at 120 ("The evidence may consist of hearsay, even entirely of hearsay.") (citing *Collins*, 259 U.S. at 317).

CALDERON's reliance on *In the Matter of the Extradition of Ernst*, No. 97 CRIM.MISC.1PG.22, 1998 WL 395267 (S.D.N.Y. July 14, 1998), is misplaced.  Importantly, the Court in *Ernst* did not find lack of probable cause based on a failure to produce original evidence.  *See id.* at *10.  Instead, the court explained that the extradition request did not sufficiently *describe* the evidence in support of probable cause. *See id.* Unlike the extradition request in *Ernst*, the extradition request from the United Kingdom provides descriptions of the information provided by eyewitnesses to the collision, a transcript of CALDERON's police interview, and a detailed description of the dashcam footage at issue.  As such, the Court's probable cause finding may be based entirely on the authenticated documentary evidence submitted by the United Kingdom.

Finally, the authenticated documents provided in support of extradition provide ample evidence of probable cause.  According to witnesses to the collision, CALDERON exceeded the speed limit and dangerously passed several cars in the minutes leading up to the collision.  In one case, CALDERON narrowly missed colliding with another vehicle when he illegal passed a car at the crest of a hill.  CALDERON did not adjust his driving following this near miss.  Instead, he chose to dangerously pass a vehicle while rounding a bend in the road, in violation of multiple road markings and posted signs.  This decision resulted in him losing control of his vehicle and striking the victim's car, which caused her serious, life-altering injuries.  This conduct clearly

satisfies the probable cause requirement as to the charge of causing serious injury by dangerous driving.

### IV. CALDERON REMAINS A SERIOUS FLIGHT RISK AND HE HAS NOT DEMONSTRATED SPECIAL CIRCUMSTANCES WARRANTING HIS RELEASE FROM DETENTION

As described in government previously filed memorandum in support of detention, CALDERON remains an extreme flight risk. *See* Dkt. 9 at 18-19. Critically, CALDERON fled the United Kingdom within weeks of receiving a summons in the criminal case against him and mere days before he was set to appear before the court in the United Kingdom.[5] *See* Dkt. 11. Thus, he remains an extreme flight risk, and allowance of bail in any amount would not guarantee CALDERON's presence in court.

Even if CALDERON were able to demonstrate he is not a flight risk, he has failed to articulate special circumstances warranting his release. CALDERON cites no authority for his apparent assertion that because he's being prosecuted for a "traffic accident" this somehow constitutes a special circumstance. Moreover, even assuming the court were amenable to find special circumstances where a fugitive is charged with a relatively minor, non-violent offense, that is not the case before the court. CALDERON's conduct, which he claims as a mere "traffic accident," left his victim with multiple broken bones from the collision, the effects from which she is still suffering. Second, as described above, CALDERON's conduct constitutes an aggravated assault under Texas law, which is a second-degree felony that is punishable by up to twenty years' imprisonment. As such, the offense for which the United Kingdom seeks to prosecute him is

---

[5] On November 3, 2023, CALDERON verbally confirmed to U.K. law enforcement that he had received the summons.

neither minor nor victimless, and it does not constitute a special circumstance warranting his release from detention.  For these reasons, CALDERON's request for release from detention should be denied.

## V. CONCLUSION

WHEREFORE, the United States requests that the Court deny CALDERON's motion and certify to the Secretary of State that CALDERON is extraditable to the United Kingdom on the charge for which his extradition is requested.

Dated: July 25, 2024                          Respectfully submitted,

                                              ALAMDAR S. HAMDANI
                                              United States Attorney

                              By:             /s/ Jay Hileman
                                              Jay Hileman
                                              Assistant United States Attorney